F. Browne GREGG, Plaintiff–Counterclaim Defendant–Appellee, Cross–Appellant,

v.

U.S. INDUSTRIES, INC., a Delaware Corporation, and U.S. Industries Management Services, Defendants–Counterclaim Plaintiffs–Appellants, Cross–Appellees.

Nos. 88–3056, 88–3676.

United States Court of Appeals, Eleventh Circuit.

Oct. 25, 1989.

Gobelman & Cobb, Jacksonville, Fla., Mark G. Krum, Irwin H. Warren, Dennis J. Block, Weil, Gotshal & Manges, New York City, for defendants-counterclaim plaintiffs-appellants, cross-appellees.

C. Harris Dittmar, Timothy J. Corrigan and Julie Hills Tucker, Jacksonville, Fla., for plaintiff-counterclaim defendant-appellee, cross appellant.

Before FAY, Circuit Judge, RONEY [*], Senior Circuit Judge, and ALLEN,[**] Senior District Judge.

FAY, Circuit Judge:

This action involves an appeal and cross-appeal from a second jury verdict in this case. In 1969, the plaintiff-appellee, cross-appellant, F. Browne Gregg sold several of his businesses engaged in construction, sand mining and design of dredging equipment to the defendant-appellant, cross-appellee, U.S. Industries, Inc. ("USI"). According to the agreement reached with USI, Gregg transferred his companies to USI for $3.5 million in USI stock, with the right to receive up to $6.5 million more in USI stock ("earn-out stock") if the former Gregg companies met specified profitability levels over the next five years. After the contract was executed, disputes arose between the parties and litigation ensued. In this appeal, USI claims that: 1) The damages awarded on Gregg's fraud claim should be set aside; 2) The trial court erred in its charge to the jury on USI's counterclaim for breach of contract and breach of warranty by requiring reliance upon Gregg's purported misrepresentations; 3) The trial court erred in failing to direct a verdict in USI's favor on Gregg's claim of tortious interference with his business relationships; and 4) The trial court erred in failing to order a new trial because the jury's verdict was the product of undue influence and prejudice. Gregg cross-appeals that: 1) The trial court erred in dis-

William F. Sondericker, Derek G.P. MacKenzie, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, James E. Cobb, Jack W. Shaw, Mathews, Osborne, McNatt,

[*] *See* Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[**] Honorable Charles M. Allen, Senior U.S. District Judge for the Western District of Kentucky, sitting by designation.

missing his conversion claim; 2) The jury should have considered the issue of punitive damages on Gregg's fraud claim; and 3) The Florida post-judgment interest rate should apply in the case. We hold that the district court properly resolved all issues at trial and therefore, we affirm its judgment.

The facts and procedural history of this case are fully set forth in this court's prior opinion reported in *Gregg v. U.S. Indus., Inc.*, 715 F.2d 1522, *modified*, 721 F.2d 345 (11th Cir.1983), *cert. denied*, 466 U.S. 960, 104 S.Ct. 2173, 80 L.Ed.2d 556 (1984). We thus set forth the facts only when necessary in the discussion of each individual issue. We note however, that after remand of this case following this court's prior opinion, the jury in the trial extending from March 16 to March 30, 1987 rendered a verdict for Gregg, and the trial court entered judgment in the amount of $38,066,801.22. This verdict comprised $8,128,515 ($18,952,469 after interest) of compensatory damages on Gregg's fraud claim; $103,340 for breach of Gregg's employment contract ($225,281.20 after interest); and $43,050 compensatory damages and $18.5 million punitive damages, which the trial court remitted to $2 million, for Gregg's claim of tortious interference with his business relationship. We now address the merits of the issues on appeal.

## I. THE FRAUD DAMAGES

### A. *Measure of Damages*

■ USI's first contention on appeal is that the trial court erred in instructing the jury on an "out-of-pocket" rather than a "benefit of the bargain" measure of damages for Gregg's fraud claim, and therefore, those damages should be set aside. Under a benefit of the bargain approach—that is, the difference between what Gregg would have received had the agreement with USI been carried through to completion and what he actually received—USI argues that the maximum amount Gregg could have recovered for the fraud would have been approximately $5.6 million. This amount represents the difference between $10 million, the maximum possible amount of USI stock which Gregg could receive under the agreement ($3.5 million in USI stock at closing plus a possible $6.5 million in USI earn-out stock), and the amount Gregg actually received, approximately $4.4 million (the $3.5 million in USI stock plus approximately $900,000 in earn-out stock). USI claims that this benefit of the bargain calculation of fraud damages was the correct method and therefore, Gregg's award under the out-of-pocket theory was improper.

At trial, the judge instructed the jury that the measure of damages for Gregg's fraud claim would be calculated under an out-of-pocket theory, that is, "the difference in value between what Gregg gave USI and the value of what he received from USI in return." (R134–118). The court stated that the object of awarding Gregg damages was to place him in the same position as before USI defrauded him. Accordingly, under this method of damage calculation, the jury awarded Gregg approximately $8.1 million in compensatory damages on the fraud claim which equalled the jury's determination of the value of Gregg's stock at closing ($12.5 million) less the value of the USI stock Gregg actually received ($4.4 million).

USI contends that, under Florida law,[1] the benefit of the bargain measure of damages is the proper approach for this case. It states that this court, in its prior opinion,[2] held that the benefit of the bargain was the correct measure of Gregg's fraud damages, and since Gregg ratified the contract by his actions subsequent to the fraud, he was limited to this measure of recovery. Gregg counters, however, that Florida law permits the trial court to in-

---

**1.** The Florida conflicts rule, which the district court sitting in Florida had to follow, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), indicates that the law of Florida, the forum, governs this question of the proper remedy for breach of contract. *See Zim v. Western Publishing Co.*, 573 F.2d 1318, 1326 n. 15 (5th Cir.1978); *Goodman v. Olsen*, 305 So.2d 753 (Fla.1974); *Wingold v. Horowitz*, 292 So.2d 585 (Fla.1974).

**2.** *See Gregg v. U.S. Indus., Inc.*, 715 F.2d 1522 (11th Cir.1983).

struct the jury on either theory of damage calculation, depending upon the circumstances of the case, to compensate the defrauded party as fully as possible for the wrong committed by the defrauder.

Our review of the relevant case law indicates that Florida follows the "flexibility theory" in fraud actions, which permits a trial court to instruct the jury under either the out-of-pocket rule or the benefit of the bargain rule, whichever will more fully compensate the defrauded party. *Martha A. Gottfried, Inc. v. Amster*, 511 So.2d 595, 599 (Fla. 4th DCA 1987); *Getelman v. Levey*, 481 So.2d 1236, 1239 n. 4 (Fla. 3d DCA 1985); *Hilsenroth v. Kessler*, 446 So.2d 147, 150 (Fla. 3d DCA 1983); *DuPuis v. 79th Street Hotel, Inc.*, 231 So.2d 532, 536 (Fla. 3d DCA), *cert. denied*, 238 So.2d 105 (Fla.1970). In *DuPuis*, the court noted that Florida has followed the out-of-pocket rule in several cases, but that it also has "adopted and followed both rules in order to do such justice as the circumstances may demand." *DuPuis*, 231 So.2d at 536. Thus, the flexibility theory provides:

'(1) if the defrauded party is content with the recovery of only the amount that he actually lost, his damages will be measured under that rule; (2) if the fraudulent representation also amounts to a warranty, recovery may be had for loss of the bargain, because a fraud accompanied by a broken promise should cost the wrongdoer as much as the latter alone....'

*Id.* (quoting 37 Am.Jur.2d Fraud and Deceit, § 352). This court has also recognized the flexibility theory under Florida law. *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 686–87 (11th Cir.1983).

Contrary to USI's assertion that a party is limited to benefit of the bargain damages when he affirms or ratifies a contract which he was fraudulently induced to enter,[3] Florida law permits a defrauded plaintiff to prove either theory of damages as justice requires to best compensate him for the defendant's wrong. *Amster*, 511 So.2d at 599. This is true even in cases alleging breach of contract along with the fraud:

'[O]ne who has been fraudulently induced into a contract may elect to stand by that contract and sue for damages for the fraud. When this happens and the defrauding party also refuses to perform the contract as it stands, he commits a second wrong, and a separate and distinct cause of action arises for the breach of contract. The same basic transaction gives rise to distinct and independent causes of action which may be consecutively pursued to satisfaction.... [A] suit on a contract and a suit for fraud in inducing the contract are two different causes of action with separate and consistent remedies.'

*Ashland Oil, Inc. v. Pickard*, 269 So.2d 714, 723 (Fla. 3d DCA 1972) (quoting *Bankers Trust Co. v. Pacific Employers Ins. Co.*, 282 F.2d 106, 110 (9th Cir.1960), *cert. denied*, 368 U.S. 822, 82 S.Ct. 41, 7 L.Ed.2d 27), *cert. denied*, 285 So.2d 18 (Fla.1973).

---

**3.** USI cites to an Eighth Circuit case applying Missouri law on damages for the proposition that when a party retains the property involved in a fraudulently induced contract, he is limited to benefit of the bargain recovery rather than to out-of-pocket damages, which would be available had he returned the property and rescinded the agreement. *Fong v. Town & Country Estates, Inc.*, 600 F.2d 179 (8th Cir.), *cert. denied*, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979). In *Fong*, however, an out-of-pocket measure of damages was utilized by the trial court and affirmed on appeal. USI contends that that measure of damages was proper in *Fong* because "[r]escission had taken place, and there had been no ratification of the bargain or retention of the benefits thereof." (Reply brief of USI at 4 n. 3). Not only is the law of Missouri inapplicable to this case, but also USI's conclusion misstates the facts in *Fong*. *Fong* did not rescind the lease contract, but was released from his lease by the new owners of the shopping center two weeks after he filed suit. However, rather than immediately vacate the premises, *Fong* remained in the shopping center for another five months, thus affirming his lease agreement, although with a new owner, during that time. He therefore, elected to stand by the lease arrangement for a period and seek damages for the misrepresentations of the original lessor. Thus, although the court in *Fong* stated that the benefit of the bargain approach is usually proper when a party retains the contract property, it examined the circumstances of the case before it and assessed the out-of-pocket measure of damages as justice required.

Considering the circumstances of this case, we find no error in the trial court's instructions on the out-of-pocket damages recovery. Here, Gregg testified that the value of his companies when he sold them to USI exceeded the value that he could receive from it under the contract he was fraudulently induced to enter. (R127–129, 130). Since the purpose of the flexibility theory is to apply the measure of damages "warranted by the particular facts of each case, and as the court finds justice demands," *Amster,* 511 So.2d at 599, the out-of-pocket approach to calculating damages best compensates Gregg for the fraud the jury determined USI perpetrated upon him.[4] The jury assessed the evidence presented regarding the value of Gregg's companies prior to the closing with USI and awarded Gregg an out-of-pocket amount of damages representing that value less the value of the stock he received from USI. This approach restored Gregg to the position he was in prior to his dealings with USI; a measure wholly consistent with the dictates of Florida law. The damages award therefore, will not be set aside.[5]

### B. *Valuation of Right to Receive Earn–Out Stock*

USI's next claim on appeal is that the trial court erred in failing to instruct the jury to value Gregg's right to receive earn-out stock as part of the consideration he received for the contract. USI argues that the jury should have been instructed to credit it not only for the earn-out stock Gregg actually received (approximately $900,000), but also for the contingent right it gave to Gregg to receive yet additional stock if the former Gregg companies reached specified profit levels in the five years following the closing. USI states that the jury determined, in its $12.5 million valuation based on an earnings theory, that the companies had large potential for future earnings and therefore, it had to find that Gregg's contingent earn-out right was correspondingly large because the earn-out was directly related to the companies' earnings potential. Thus, USI maintains that the jury instruction regarding calculation of Gregg's compensatory fraud damages was erroneous, and the award must be set aside.

The record indicates that USI raised its challenge to the jury instruction after the parties had initially agreed to the charge as set forth in the charge conference.[6] *See* (R132–133, 134; R19–485). As the parties prepared to present final arguments to the jury, USI's counsel told the trial court that, although they failed to mention it at the charge conference, they wished the words "including his right to receive earnout stock" appended to the fraud instruction. *See* (R134–5). Although USI challenged the instruction so late in the proceedings, Rule 51 of the Federal Rules of Civil Procedure permits a party to do so if the party objects before the jury retires to consider

---

**4.** We note that under Florida law, "[i]n tort actions, the measure of damages seeks to restore the victim to the position he would be in had the wrong not been committed." *Ashland Oil,* 269 So.2d at 723; *accord Glades Oil Co. v. R.A.I. Management, Inc.,* 510 So.2d 1193, 1195 (Fla. 4th DCA 1987).

**5.** USI also argues that this court's opinion in the first appeal established the benefit of the bargain rule as the proper measure of damages and thus, the trial court's instructions on remand were erroneous. *Gregg,* 715 F.2d at 1532–33, 1541–42. We find no merit in this argument. In the prior appeal, USI challenged only the portion of the trial court's instructions that did not permit the jury to include approximately $900,000 in earn-out stock as part of the value Gregg received in determining his out-of-pocket loss. USI did not appeal the out-of-pocket mea-

sure itself, and this court found no fault with its application on remand provided that USI received credit for the earn-out amount in the damages calculation.

**6.** At the charge conference, the parties carefully discussed the jury instruction to be given at trial concerning the fraud damages. Although USI objected to a portion of the charge as being "too complicated," upon argument and revision the court concluded that the charge would read: "'Therefore, you should award Gregg an amount of damages equal to the difference in value between what Gregg gave USI and the value of what he received from USI in return.' And—." To this the attorney for USI replied "We have no objections to that." (R132–134). Thus, the actual jury instruction given at trial had been revised upon agreement by both parties and approved by USI.

its verdict. Accordingly, we consider on appeal "the challenged instructions as part of the entire charge, in light of the allegations of the complaint, the evidence presented, and the arguments of counsel, to determine whether the jury was misled and whether the jury understood the issues." *Pate v. Seaboard R.R., Inc.*, 819 F.2d 1074, 1077 (11th Cir.1987) (footnote omitted).

USI asserts that the jury was misled because the trial court's instruction disregarded this court's prior ruling on the fraud damage issue. On the contrary, we find that even without reference to the additional language USI requested, the district court's instruction directed the jury to take into account the earn-out payment of approximately $900,000 USI remitted to Gregg in calculating Gregg's out-of-pocket loss, the amount to which the prior appeal was directed. This court's prior opinion states that "the earnout provision is not too speculative and uncertain to be considered in calculating damages.... [T]he uncertainty in amount of ... the earnout, [was] reduced by trial time because [this] amount had become known." *Gregg*, 715 F.2d at 1533. Therefore, it was permissible for the jury to value Gregg's right to receive earn-out stock as the amount of the one payment USI actually made to Gregg for this purpose.

In addition, it does not necessarily follow that because the jury determined that the former Gregg companies had large potential for future profits, that the earn-out would be correspondingly large. The jury apparently concluded that it was USI's fraud in failing to provide working capital and refusing to allow Gregg to run his companies that deprived Gregg of his right to receive additional stock and limited the value of that contingent right to $900,000. Considering the entire record as it relates to the jury instructions given, including the evidence presented by both parties and the arguments of counsel, we hold that the jury was fully apprised of and understood the issues for consideration in awarding compensatory damages on Gregg's fraud claim. Thus, we find no error in the trial court's instruction.

### C. *Propriety of Jury's Valuation of Plaintiff's Companies*

■ USI next contends that the district court erred in denying its motions for directed verdict, judgment notwithstanding the verdict, and new trial on Gregg's fraud claim. USI argues that the jury's award of $8.1 million resulted from its erroneous valuation of Gregg's companies at $12.5 million; a figure based solely on Gregg's own opinion as to the worth of his companies. USI claims that both the jury's valuation and Gregg's opinion were flawed because they failed to take into account the status of a dredging job in progress, Canal 38 ("C–38"), at the time the parties entered into the contract. According to USI, at the time of closing, the C–38 job was incurring losses and overruns which Gregg failed to consider in his valuation of the companies. Thus, USI maintains that the value of the businesses Gregg sold to it was much less than he acknowledged, and therefore, the verdict cannot stand.

Motions for judgments n.o.v. and directed verdicts test the sufficiency of the evidence supporting a jury verdict. *J & H Auto Trim Co. v. Bellefonte Ins. Co.*, 677 F.2d 1365, 1368 (11th Cir.1982). Consideration of the sufficiency of the evidence is a question of law subject to de novo review by this court. *Id.* We therefore apply the same standard on appeal as the trial court applied in rendering its initial ruling. *Id.* In evaluating the district court's denial of a motion for directed verdict or judgment n.o.v.:

[T]he Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion.... [I]f there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the tradi-

tional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses. *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (en banc) (footnote omitted).[7] Motions for a new trial are within the sound discretion of the district court. *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984). Our review of the district court's denial of a new trial involves determining whether the trial judge clearly abused his discretion. *Pate,* 819 F.2d at 1077. With these principles in mind, we turn to the merits of USI's claim.

The jury awarded Gregg $8.1 million in compensatory damages for his fraud claim based on its valuation of Gregg's companies as of the closing at $12.5 million less the $4.4 million in USI stock (including the earn-out) which USI actually paid to Gregg. Gregg's testimony at trial supports the jury verdict. He testified that at closing, the value of his companies "was 12–and–a–half million." (R127–129). Contrary to USI's assertion that Gregg's valuation of his company was predicated upon a pre-closing discussion with a USI employee and, therefore, was not an independent valuation opinion, Gregg stated that "when I was first contacted by USI *we had evaluated* the company right at $10 million, basically on the same basis that they evaluated it on, an earnings ratio." *Id.* (emphasis supplied). Moreover, Gregg testified regarding the additional $2.5 million in value he personally placed into the companies at closing:

> I put in a million dollars as they requested early. I put in $400,000 that had been—was requested. I gave them a $500,000 note. I put in the office building, I put in the—I forgave the indebtedness that the company owed me, and that comes to approximately two million five hundred.

*Id.* at 130. USI did not object to this testimony nor comment on it at summation to the jury.

This court has recognized that, in Florida, an owner of property is qualified to testify regarding the value of his property. *Electro Servs., Inc. v. Exide Corp.,* 847 F.2d 1524, 1526 (11th Cir.1988); *Neff v. Kehoe,* 708 F.2d 639, 644 (11th Cir.1983); *J & H Auto Trim,* 677 F.2d at 1369; *Hill v. Marion County,* 238 So.2d 163, 166 (Fla. 1st DCA 1970). In addition, an officer of a corporation may testify to the value of the property "if the officer is qualified by virtue of his experience, his management of the affairs of the corporation and his knowledge of relevant value." *Mercury Marine Div. v. Boat Town U.S.A., Inc.,* 444 So.2d 88, 90 (Fla. 4th DCA 1984). Here, Gregg could testify under both conditions. His position as founder, owner and manager of his companies from their inception made him uniquely qualified to render an opinion as to the value of his businesses.

USI's contention that Gregg's evaluation of his businesses was incomplete and flawed is directed at the weight of his testimony, rather than its admissibility. "The weight of such testimony is, of course, affected by the owner's knowledge of circumstances which affect value, and as an interested witness, it is for the jury to evaluate the credibility of his testimony." *Berkshire Mutual Ins. Co. v. Moffett,* 378 F.2d 1007, 1011 (5th Cir.1967) (footnotes omitted). The owner's valuation may be attacked at trial through cross-examination and submission of independent evidence refuting his estimate. *Neff,* 708 F.2d at 644. USI did not cross-examine Gregg on this point at trial. However, it did present expert testimony as to its valuation of the companies.

USI's experts testified at trial that the former Gregg companies actually had a negative or minimal value at the time of closing in 1969, primarily due to losses incurred in completing the C–38 dredging project.[8] While it was proper for USI to challenge Gregg's valuation of his company in this manner, it was equally permissible

---

7. The Eleventh Circuit in *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

8. We refuse to disturb the jury's verdict on the ground that Gregg's alleged misrepresentations concerning the C–38 project established that his valuation of the companies was flawed as a

for the jury to reject the experts' opinions. USI did not object to the proposed jury instruction regarding the expert testimony. *See* (R132–132). Nor did it dispute the charge given at trial that the jury was to consider the expert testimony and give it the weight the jury determined the testimony deserved.[9] (R134–117). Even uncontradicted expert opinion testimony is not conclusive, and the jury has every right not to accept it. *Remington Arms Co., Inc. v. Wilkins*, 387 F.2d 48, 54 (5th Cir.1967).

The jury here apparently found Gregg's testimony credible. Our review of the record concerning the valuation indicates that Gregg presented substantial evidence from which reasonable jurors could conclude that the companies had a value of $12.5 million at closing.[10] Gregg testified that he independently valued his companies at $10 million based on an earnings ratio, and he detailed the additional $2.5 million in cash and capital that he put into the businesses. It was wholly within the jury's function to credit Gregg's valuation. *Boeing*, 411 F.2d at 375. We therefore, refuse to set aside the jury's award of damages on Gregg's fraud claim.[11]

## II. THE BREACH OF WARRANTY COUNTERCLAIM

■ USI next argues on appeal that the trial judge committed prejudicial error in

matter of law. The juries in both trials of this case rejected USI's claims under fraud, breach of contract and breach of warranty that Gregg misrepresented the value of his businesses. *See Gregg*, 715 F.2d at 1543; (R19–491). Just as the jury could reject USI's contentions on those claims and conclude that Gregg properly represented the status of his companies to USI, so too could it evaluate the evidence produced at trial and credit Gregg's valuation testimony over USI's.

9. The district court instructed:

You should consider each expert opinion received in evidence in this case and give it such weight as you may think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence, then you may disregard the opinion entirely.
(R134–117).

charging the jury that reliance was an essential element of USI's breach of warranty counterclaim, and therefore, the district court should have granted its motion for a new trial. USI contends that its contract with Gregg to purchase his companies was explicitly predicated upon the accuracy of Gregg's representations and warranties, particularly those regarding the financial condition of his businesses. USI claims that it produced evidence at trial that Gregg breached the contract and its warranties by materially misrepresenting the status of the C–38 dredging job in progress as of the closing. It maintains that Gregg failed to accurately state the financial condition of the companies because he did not follow generally accepted accounting principles in his bookkeeping, and because he failed to record a major loss and provide for adequate company reserves which resulted in a material overstatement of the companies' net income.

At the outset, we recognize that we are reviewing a case brought before the United States District Court for the Middle District of Florida on the basis of diversity jurisdiction. The parties cite to New York law in arguing this issue.[12] Accordingly, in asserting that the jury charge on breach of warranty was erroneous, USI states that

10. For example, the jury could have concluded that although Gregg's companies were in a weak cash flow position, their profitability was good and the company was still making money. *See* (R129–69, 76–77); (R127–45). Thus, the jury could, and in fact did, find that the earnings potential of the companies was large, and consequently their value was great, particularly in light of USI's representations that it would sink great amounts of working capital into the operation of the companies after closing. *See* (R127–51, 52, 54, 57, 60, 67, 84–85).

11. For the same reasons, we find that the trial court did not abuse its discretion in denying USI's motion for a new trial. We also hold that USI's contention that Gregg's verdict on the fraud claim was contrary to the overwhelming weight of the evidence, is without merit.

12. Both parties agree that according to the signed Agreement and Plan of Reorganization, New York law governs the substantive aspects of this issue. *See* (Pl. Exh. 23 ¶ 16).

under New York law, where an express warranty or representation exists as part of a signed writing, reliance need not be proven to establish a breach of contract. Gregg counters, however, that New York law requires that a party establish reliance before it can recover for a breach. Courts construing the reliance issue under New York law acknowledge that this is an unsettled area of law. *Ainger v. Michigan Gen. Corp.*, 632 F.2d 1025, 1026 n. 1 (2d Cir.1980); *Ostano Commerzanstalt v. Telewide Sys., Inc.*, 608 F.Supp. 1359, 1365 (S.D.N.Y.1985), *aff'd in pertinent part*, 794 F.2d 763 (2nd Cir.1986); *CPC Int'l Inc. v. McKesson Corp.*, 134 Misc.2d 834, 513 N.Y.S.2d 319, 322 (N.Y.Sup.Ct.1987). Our review of the district court's charge to the jury thus involves not only an analysis of whether "the charges, considered as a whole, sufficiently instruct the jury so that the jurors understand the issues involved and are not misled," *Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 750 F.2d 1516, 1525 (11th Cir.1985), but also consideration of the status of the New York law in this area as presented by the parties to the trial judge at the time the jury instruction was formulated.

USI argues that under New York law, reliance need not be proven in cases where the parties have made an express warranty part of the contract and where the warranty was breached. *Ainger v. Michigan Gen. Corp.*, 476 F.Supp. 1209, 1223–27 (S.D.N.Y.1979), *aff'd on other grounds*, 632 F.2d 1025 (2d Cir.1980); *Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*, [1987–1988 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 93,700 at 98,225, 1988 WL 36330 (S.D.N.Y. Apr. 11, 1988); *CPC Int'l*, 513 N.Y.S.2d at 322–23. Gregg however, points to several cases on New York warranty law which hold that a buyer cannot recover for breach of an express warranty unless he first shows that he relied upon the warranty. *Crocker Wheeler Elec. Co. v. Johns–Pratt Co.*, 29 A.D. 300, 302, 51 N.Y.S. 793, 794 (N.Y.App.Div.1898), *aff'd*, 164 N.Y. 593, 58 N.E. 1086 (1900); *Holdridge v. Heyer–Schulte Corp.*, 440 F.Supp. 1088, 1104 n. 9 (N.D.N.Y.1977); *Scaringe v. Holstein*, 103 A.D.2d 880, 477

N.Y.S.2d 903, 904 (N.Y.App.Div.1984); *Friedman v. Medtronic, Inc.*, 42 A.D.2d 185, 345 N.Y.S.2d 637, 643 (N.Y.App.Div. 1973); *Ellen v. Heacock*, 247 A.D. 476, 286 N.Y.S. 740, 742 (N.Y.App.Div.1936). Upon review of the relevant case law, we agree with the New York courts that it is unsettled whether reliance is required in breach of warranty cases. Accordingly, we consider whether, under this state of the New York law, the trial judge erred in his instructions to the jury.

The trial judge instructed the jury in relevant part that:

> In order to find Gregg liable on this claim, you must find all of the following:
> One. That Gregg made a misrepresentation as to a material fact.
> Two. That USI entered into the Agreement and Plan and Employment Agreement in reliance on that misrepresentation of fact;
> And three. That USI was damaged as a result.
>
> A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended to relieve the promisee of any duty to ascertain the fact for itself. It amounts to a promise to indemnify the promisee for any loss if the fact warranted proved untrue. It is immaterial whether the person who made the warranty in issue made it under misinformation and in good faith. If you find that Gregg made any warranty of material fact upon which USI was entitled to rely and did in fact rely, and that the warranty given was breached, then your verdict should be for USI on this claim.
>
> If you find that USI relied upon its own investigation of the former Gregg companies rather than on the representations of those companies made by Gregg, then USI has not proved the essential requirement of reliance under this claim and you must find against USI and in favor of Gregg on this claim.

(R134–123, 124). We find that this instruction, when considered in light of the charges as a whole, properly informed the jury of the issues in the case and the

applicable law. Many cases under New York warranty law support the district court's charge that a showing of reliance is necessary to establish a breach of warranty claim. *See e.g. Crocker Wheeler*, 51 N.Y.S. at 794; *Holdridge*, 440 F.Supp. at 1104 n. 9; *Friedman*, 345 N.Y.S.2d at 643. Although we recognize that these cases are primarily New York sales of goods decisions under the Uniform Commercial Code, it is reasonable to extend the reliance requirement applicable in sales cases to situations involving the transfer or sale of securities. *See Land v. Roper Corp.*, 531 F.2d 445, 448 (10th Cir.1976). Since the vast majority of states follow the U.C.C., including New York, we cannot criticize the trial judge for instructing the jury in accordance with that law.

 Nor are we prepared to hold that the trial judge committed reversible error in instructing the jury based upon what the parties represented to him as the law on this point.[13] Other than the *Ainger* case, the cases cited by USI in its brief on appeal were not available to the trial judge when formulating the jury instructions. Most of the cases cited by Gregg were available to the district court and represented the existing law of New York on the reliance issue in warranty cases. Even a reading of *Ainger* shows that the Second Circuit, in affirming the district court on other grounds, refused to join the ongoing debate in the New York courts over the reliance issue. *Ainger*, 632 F.2d at 1026. The Second Circuit stated that the district court's discussion of New York law on reliance was dicta since the trial court held that reliance was established in the case. *Id.* at 1026 n. 1. The circuit court noted that "[b]ecause there was reliance in this case, we will not speculate how the New York courts would decide a case in which there

was none." *Id.* We also refuse to speculate here, especially when ample law supports the trial court's instruction that reliance must be proven in a breach of warranty case.

The district court correctly instructed the jury as to the law on breach of warranty based on what was represented to it. "When the instructions, taken together, properly express the law applicable to the case, there is no error even though an isolated clause may be ... subject to criticism." *Johnson v. Bryant*, 671 F.2d 1276, 1280 (11th Cir.1982). We do not doubt that the jury was properly guided in its deliberations by the court's charge. *See Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1372 (5th Cir. July 1981). It considered and weighed the evidence regarding USI's breach of warranty counterclaim and returned a verdict in favor of Gregg. Since we find no error in the trial judge's jury instruction, we hold that the district court acted well within its discretion in denying USI's motion for a new trial.

### III. THE TORTIOUS INTERFERENCE CLAIM

 USI next argues on appeal that the trial court erred in failing to direct a verdict for it or grant its motions for judgment n.o.v. and new trial on Gregg's claim of tortious interference with his business relationships. At trial, Gregg presented evidence that USI tortiously interfered with the business relationship he maintained with his bank. After considering the evidence, the jury awarded Gregg $43,050 in compensatory damages and $18.5 million in punitive damages, which the trial judge remitted to $2 million. USI contends that the evidence does not support the

---

**13.** The parties are responsible for directing the court to the proper law supporting the jury instructions to be given at trial. The district court must rely upon counsel, especially when the law is that of a state other than that in which the district court sits, and particularly when that law is unsettled. In this situation, it is imperative that the parties fully inform the trial judge as to all authorities touching upon the subject. USI failed to advise the court of the basis for the proposed jury instructions concerning the breach of warranty issue. *See* (R19–483). At the charge conference, it cited to two cases already cited by Gregg's counsel on this issue. (R133–16). Only after much discussion on the reliance issue did USI finally refer to the one New York case supporting its position that reliance is not required in express contractual warranty situations. Such conduct is not in accord with the duties of attorneys as officers of the court.

jury's verdict for Gregg on this issue, and therefore, the trial court should have granted USI's motion for a new trial.

In December 1971, Gregg pledged the USI stock he had received under his contract with USI to the Leesburg Bank in Florida as security for a $1.5 million loan. (R128–18). In April 1972, Gregg did not pay the second installment on a $500,000 note he executed in favor of his former companies. (R128–21). On May 24, 1972, USI told its stock transfer and dividend disbursing agent, Chemical Bank in New York, to stop payment on Gregg's USI dividends. (R129–86). Gregg subsequently told USI "that they had violated the contract with me and that I was going to—I was not going to pay any more on this note, it was going to be held as an off-set to their contract." (R128–22). The parties dispute the motivation behind USI's action in stopping payment of the dividends accrued on Gregg's USI stock. The record indicates that the value of the checks withheld was approximately $65,000. (R128–29 to 34).

On June 15, 1972, Gregg borrowed an additional $135,000 from the Leesburg Bank and as security, assigned to the bank all dividends from his USI stock. (R128–26 to 28). USI received notice of the assignment on June 19, 1972. *Id.* Later in 1972, the price of USI's stock fell and the Leesburg Bank issued margin, calls to Gregg. When he did not respond, the bank began selling his stock. (R132–74). Gregg then demanded that USI pay the dividends to the Leesburg Bank and USI refused to do so. (R128–40). These actions formed the basis for Gregg's claim that USI tortiously interfered with his business relationship with the Leesburg Bank.

In assessing whether the trial court erred in denying USI's motions to set aside the verdict, we examine the record and all the evidence presented, in the light and with all reasonable inferences most favorable to Gregg, the party opposed to the motions. *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc). Under the settled law of Florida,[14] tortious interference with a business relationship requires "proof of each of three elements: (1) The existence of a business relationship under which the plaintiff has legal rights; (2) an intentional and unjustified interference with the relationship by the defendant; and (3) damage to the plaintiff as a result of the tortious interference with the relationship." *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1534 (11th Cir.1985); *accord Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla. 1985); *Ethyl Corp. v. Balter*, 386 So.2d 1220, 1223 (Fla. 3d DCA 1980), *review denied*, 392 So.2d 1371 (Fla.), *cert. denied*, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981). USI maintains that Gregg failed to adduce evidence to support the jury's finding of liability and damages on this claim.

A. *Liability*

The record indicates that Gregg presented substantial evidence as to all the elements required to establish a claim for tortious interference with a business relationship. Gregg showed at trial that he had a relationship with the Leesburg Bank in which the bank had loaned him substantial amounts of money secured by the USI stock Gregg held and by Gregg's right to receive dividends on that stock. (R129–18, 22). Gregg established that USI was aware of the relationship he had with the Leesburg Bank regarding the assignment of his right to receive dividends on the USI stock.[15] (R128–26, 27). He also submitted

---

**14.** Although USI contends that New York law applies to this claim, it concedes that the laws of Florida and New York are not materially different regarding the requisite elements of tortious interference. (USI brief at 30 n. 17). Since both parties agree to the application of Florida law on this point, we analyze that law accordingly.

**15.** Not only did Gregg testify that USI had notice of the assignment of his dividend rights to

the Leesburg Bank, (R128–26, 27), he introduced into evidence a letter from the Leesburg Bank to USI stating, in part:

Please find enclosed original and copy of letter and assignment given to us by Mr. F. Browne Gregg, pertaining to dividends of U.S. Industries, Inc. stock registered in his name. We assume this assignment will be placed immediately in your records and cover any

evidence that USI intentionally interfered with his banking relationship when USI instructed its dividend disbursing agent, Chemical Bank, not to release Gregg's dividend checks to him or the Leesburg Bank. (R129–85 to 88). USI knew that Gregg had pledged his dividends as collateral for the loan the Leesburg Bank made to him and that if USI did not release the declared dividends, Gregg's bank would begin liquidating his USI stock [16] (R129–101); yet it intentionally failed to disburse the funds to either Gregg or his bank.

USI does not contest these facts. Rather, it argues that Gregg failed to establish additional acts on USI's part that would convert this claim sounding in breach of contract, into a tort claim supporting punitive damages. USI maintains that Gregg did not meet Florida's independent tort requirement, and thus, his claim is nothing more than one for breach of contract. We disagree. Florida law does not require a plaintiff to prove that the conduct or acts giving rise to a tort claim are different from or additional to those acts that support the plaintiff's breach of contract claim. "[W]here the acts constituting a breach of contract also amount to a cause of action in tort there may be a recovery of exemplary damages upon proper allegations and proof." *Griffith v. Shamrock Village,* 94 So.2d 854, 858 (Fla. 1957); *accord Lewis v. Guthartz,* 428 So.2d 222, 223 (Fla.1982); *Nicholas v. Miami Burglar Alarm Co.,* 339 So.2d 175, 178 (Fla.1976).

Regardless, Gregg did prove additional conduct by USI showing that it acted intentionally and without justification to interfere with Gregg's business relationship with his bank. In addition to Gregg's presentation of evidence that USI knew that if it failed to pay the declared dividends to Gregg or the Leesburg Bank that the bank would liquidate Gregg's stock, and that USI nevertheless intentionally chose to ignore the Leesburg Bank request, Gregg established that USI wrongfully diverted the dividend checks back to itself even though it could not obtain access to those funds. USI instructed Chemical Bank to change Gregg's address on his dividend checks, without his knowledge or authorization (R129–95, 149), from his address in Leesburg, Florida, to USI's address in New York.[17] (R129–92, 96, 97, 154). Moreover, an assistant treasurer from Chemical Bank testified that the dividends from USI stock

dividend checks presently pending or to be issued in the near future.
(Pl.Exh. 721). USI received this letter, and the enclosed assignment executed by Gregg, on June 19, 1972.

16. Most illustrative of USI's knowledge of Gregg's predicament was a letter USI sent to its bank, Chemical, which states:
By telephone last week you notified us that the First National Bank of Leesburg, Florida had confirmed to you that it was then their present intention to sell certain shares of USI capital stock registered in the name of F. Browne Gregg for the reason that such stock had declined in value and accordingly, a secured loan from the Leesburg Bank to Mr. Gregg was undercollateralized. You further reported that the Leesburg Bank also informed you that it would not proceed to liquidate the collateral if Chemical Bank as dividend-paying agent for U.S. Industries, Inc. immediately forwarded previously declared dividends which [USI] had instructed you to withhold.
In our conversations we informed you that our original instructions to you were unchanged and that cash representing dividends

in respect of shares registered in the name of F. Browne Gregg should not be disbursed. In accordance with your request we also informed you that we would and we hereby do indemnify you and hold you harmless against any and all claims, damages and expenses of every kind and nature, including but not limited to counsel fees, arising out of Chemical's compliance with our aforesaid instructions. (Pl. Exh. 167).

17. Gregg introduced into evidence a letter from Chemical Bank's corporate trust department to USI which said:
As requested by telephone, the address for dividends *only* for the subject shareholder has been changed as follows:
F. Browne Gregg
C/O U.S. Industries, Inc.
250 Park Avenue
New York, N.Y. 10017
Att: Miss Mary Marchese
We are enclosing the following checks upon instructions from Mr. Toole:
Common dividend payable June 19, 1972 $10,-640.76 Spec. Pref. Series M dividend payable June 1, 1972 $13,125.00
(Pl. Exh. 166) (emphasis supplied).

are placed in a special dividend trust account for each shareholder (R129–80 to 82), and that if a shareholder did not receive the dividend checks, the funds could not go back to USI to be utilized by it, but would remain in the dividend account until it was escheated by the state. (R129–84). These actions evidence improper [18] interference with Gregg's business relationship.[19] *See G.M. Brod & Co.*, 759 F.2d at 1535; *Ethyl Corp.*, 386 So.2d at 1225; *Nitzberg v. Zalesky*, 370 So.2d 389, 391 (Fla. 3d DCA 1979).

### B. *Damages*

Gregg also presented evidence "that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions" concerning the damages he suffered as a result of USI's interference with his business relationship with the Leesburg bank. *Boeing Co.*, 411 F.2d at 374–75. Gregg introduced evidence that because USI refused to pay his dividends to the Leesburg Bank, the bank was required to sell Gregg's stock, which was declining in value, to satisfy his loans. Gregg also testified at trial that he was unable to obtain loans from the Leesburg Bank following USI's actions in refusing to disburse the declared dividends. (R128–42). This testimony was not objected to nor contradicted by USI.

The jury, in considering all the evidence presented over several days of trial and all the reasonable inferences to be drawn from that evidence, including Gregg's uncontroverted testimony, could find that USI's actions regarding the dividends and the Leesburg Bank caused Gregg damage. In addition, the jury could have determined that had USI released the dividends, the Lees-

burg Bank would not have liquidated Gregg's stock, a drastic measure taken by banks when loans become undercollateralized or no longer secured to the bank's satisfaction, prevention or delay of which would have been a benefit to Gregg; a benefit which he was denied, thus causing him damage.

We hold that the evidence in the record supports the jury's determination that Gregg established his claim for tortious interference with his business relationship. The jury's award of $43,050 in compensatory damages was also supported by the range of the evidence. *See Jamison Co. v. Westvaco Corp.*, 526 F.2d 922, 936 (5th Cir.1976). Thus, we find that the trial court did not abuse its discretion in denying USI's motion for a new trial. We refuse to set aside the jury's award on this issue.

### C. *Punitive Damages*

USI also argues under this claim that Gregg's punitive damages award must be set aside. It contends that since there was no basis for the jury's finding of liability or compensatory damages for the tortious interference issue, punitive damages could not be awarded. USI further states that it was entitled to a directed verdict because the evidence of USI's conduct regarding tortious interference did not rise to the level of "reckless, malicious or offensive character" necessary to support an award of punitive damages. *G.M. Brod*, 759 F.2d at 1537.

We find that the evidence presented in the record supports the award of punitive damages as remitted by the trial court. Since we affirmed the district court's denial

---

**18.** USI's actions were also unjustified. This court, in its prior opinion, rejected USI's contention that it could properly retain the dividends because it was exercising a legitimate right to setoff those dividends against the $500,000 note Gregg made to his former companies. *Gregg*, 715 F.2d at 1540. This court noted that USI never took any action to execute the setoff, but merely retained control of the dividend funds while pursuing its claim for the full amount of the unpaid principal on Gregg's note. *Id.* at 1539. USI does not argue justification in this appeal.

**19.** We reject USI's argument that it is not liable to Gregg for its failure to pay the dividends because, under the Uniform Commercial Code, USI had no legal duty to pay the dividends to the Leesburg Bank. *See* Fla.Stat. § 678.207(1) (1986). Despite whether USI was entitled to consider Gregg, and not the Leesburg Bank, as the proper recipient of the dividend checks, USI still knew of the assignment of the dividends to the Leesburg Bank and knew that it would interfere with the relationship if it instructed Chemical Bank not to release the funds to *either* Gregg or his bank.

of USI's post-trial motions on the ground that the evidence supported the jury's finding of tortious interference and its award of compensatory damages, we agree with the trial court that a basis for punitive damages on this claim exists. *See Buonopane v. Fritz,* 477 So.2d 1030 (Fla. 4th DCA 1985) (a party may recover punitive damages if compensatory damages are awarded); *Hauser v. Van Zile,* 269 So.2d 396, 399 (Fla. 4th DCA 1972) (exemplary damages recoverable in tort action if actual damages shown). Viewing all the circumstances most favorably to Gregg, we conclude that he presented sufficient direct and circumstantial evidence of a "reasonable basis for an inference of wantonness, actual malice, deliberation, gross negligence, or utter disregard of the law on defendant's part ... legitimately drawn by the jury trying the case." *Winn & Lovett Grocery Co. v. Archer,* 126 Fla. 308, 171 So. 214, 222–23 (Fla.1936).

Florida courts have stated that:

[M]alice can be proved in the absence of direct evidence ... by proving a series of acts which, in their context or in light of the totality of surrounding circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will, or other bad motive.

*Southern Bell Tel. & Tel. Co. v. Roper,* 482 So.2d 538, 539 (Fla. 3d DCA 1986); *accord McCurdy v. Collis,* 508 So.2d 380, 382 (Fla. 1st DCA 1987). The circumstances and the degree of the defendant's wantonness or culpability are factors to be considered in assessing whether punitive damages are appropriate. *Bankers Multiple Line Ins. Co. v. Farish,* 464 So.2d 530, 533 (Fla.1985). An examination of the totality of the circumstances in this case shows that USI exhibited a course of conduct motivated by ill will.

USI's refusal to pay the declared dividends it owed to Gregg on his stock was undertaken by wholly improper means. USI's prior attempts to rationalize or justify its actions, by arguing that it was exercising a right to setoff, was rejected by this court because USI never applied the dividend funds to Gregg's note obligation. As previously discussed, USI knew that it could not legally obtain access to the dividend funds, but it nevertheless chose to wrongly divert Gregg's checks back to its corporate office in New York where those funds would sit until the state escheated it. The jury could properly conclude that such action evidenced USI's attitude that it meant to cause Gregg damage to his banking relationship, especially when the Leesburg Bank informed USI that it would not liquidate Gregg's stock if USI disbursed the dividends. Evidence of USI's offensive intent[20] was further shown by its assur-

---

**20.** Gregg also presented evidence of several incidents which, when viewed in the light of the surrounding circumstances, help show USI's reckless indifference to Gregg's business relationship. As outlined in Gregg's closing argument (R134–57 to 59), to which USI did not object, these incidents included: USI's deliberate plan to oust Gregg as president of his former companies (R129–107 to 111; Pl. Exh. 133, 135; R130–46, 47), which plan included placing a USI employee in Gregg's organization whom USI intended would replace Gregg and with whom USI secretly communicated (R127–194, 196, 197 to 200, 202; R128–132 to 136, 140, 158; R129–27, 60, 124 to 128); the deception employed by USI in bringing Gregg to Dallas, Texas for a meeting without his attorney at which USI fired Gregg and then pressed him to acquiesce in its actions by signing an agreement without his counsel's assistance (R129–118 to 120; R127–217, 218); USI's directive to Gregg to "get out and stay out" of his companies which he had built over a course of twenty-five years, and its order to him not to speak to any of his former employees (R127–217, 218); USI's threat to Gregg to drag out any lawsuit he might bring against USI for four or five years (R127–218); USI's degradation of Gregg before his former employees when it told them Gregg had been fired as president (R127–219); USI's refusal to inform Gregg that it was withholding his dividends, while simultaneously demanding that he pay the $500,000 note (R129–149); USI's unilateral change of address on Gregg's dividend checks from Leesburg, Florida to USI's offices in New York (R129–153, 154); and USI's refusal to reimburse Gregg for expenses he incurred while assisting USI in its claims with the Army Corps of Engineers, along with its refusal to pay Gregg's salary and benefits (R128–22, 45) which even USI admitted was wrongful (R134–91). The jury could properly consider these underlying facts in assessing the credibility of the witnesses and the nature of the evidence as to USI's wanton or malicious state of mind in its dealings with Gregg and his business relationships.

ances to Chemical Bank that it would indemnify the bank for any claim that Gregg might make against it, thereby facilitating Chemical Bank's wrongful refusal to pay Gregg's declared dividends. (Pl. Exh. 167).

Upon careful review of the record, we conclude that a basis existed for the jury's award of punitive damages, and that the trial judge's remittitur of the award from $18.5 million to $2 million was proper. *See St. Regis Paper Co. v. Watson,* 428 So.2d 243, 247 (Fla.1983). The trial court, after "consideration of the entire record, the nature, extent, and enormity of the tortious interference, all the circumstances in relation to the tort, and the net worth of the Defendant," found that the punitive damage award should be remitted to $2 million. (R20–516–5). This amount is not excessive. A punitive damages award is considered excessive when the amount of damages is out of proportion to the degree of malice or wantonness of the defendant's conduct in relation to the defendant's financial worth. *Arab Termite and Pest Control v. Jenkins,* 409 So.2d 1039, 1043 (Fla.1982). The award of $2 million is .4% of USI's net worth of $520 million (R18–442). Thus, the district court properly allowed Gregg an amount of punitive damages commensurate with the degree of USI's offensive conduct and in proportion to its financial worth. We therefore, affirm the court's denial of USI's motion for a new trial on this issue.

## IV. CONCLUSION

We find the remaining issues on appeal and cross-appeal to be without merit. The punitive damages award for Gregg's tortious interference claim is not invalid on constitutional grounds. Nor did the district court abuse its discretion in denying USI's motion for a new trial on all counts and issues. In addition, the trial court properly denied Gregg's claim for conversion and correctly declined to retry Gregg's claim to punitive damages on his fraud count. Finally, the district court properly applied the federal post-judgment interest rate in this diversity case. *See G.M. Brod & Co. v. U.S. Home Corp.,* 759 F.2d 1526, 1542 (11th Cir.1985).

Accordingly, we hold that the district court properly resolved all claims and issues at trial and therefore, the judgment of the district court is AFFIRMED.