William Pena WELLS, Plaintiff,

v.

Kati MARTON, International Creative Management, Inc., Conde Nast Publications, Inc., Defendants.

No. 90–2072–CIV.

United States District Court,
S.D. Florida.

June 26, 1991.

William Wells, pro se.

Thomas R. Julin, Steel Hector & Davis, Miami, Fla., for defendants.

## ORDER GRANTING MOTION FOR FINAL SUMMARY JUDGMENT

C. CLYDE ATKINS, Senior District Judge.

THIS CAUSE comes before the Court on Defendants' Motion for Final Summary Judgment[1], Defendant Marton's Motion to Dismiss the Amended Complaint, or alternatively for Final Summary Judgment on jurisdictional grounds and Plaintiff Wells' Motion for Summary Judgment on Issue of Liability against Defendant Kati Marton. After careful consideration of the pleadings, the relevant law, the Magistrate's Report and Recommendation (D.E. 50) and upon an independent review of the entire file, it is hereby

ORDERED AND ADJUDGED that (1) the Defendants' Motion for Final Summary Judgment is GRANTED, (2) the Plaintiff's Motion for Summary Judgment on the Issue of Liability against Kati Marton is DENIED and (3) the Defendant Marton's Motion to Dismiss or for Final Summary Judgment on jurisdictional grounds is deemed moot in light of the above rulings.

## I.

## FACTS AND BACKGROUND

The undisputed material facts are as follows. Plaintiff, William Pena Wells (hereafter "Wells"), an attorney licensed in Florida, contacted Amanda Urban (hereafter "Urban"), an employee of defendant Creative Management, Inc. and claimed to represent Dr. Antall. Affidavit of Urban page 1; Exhibit D of Affidavit of Wells. Dr. Antall was at the time a candidate for the post of Prime Minister of the Republic of Hungary and Wells was interested in finding an author to collaborate on Dr. Antall's biography. *Id.* at page 2. Urban previously had represented Kati Marton (hereafter "Marton"), a freelance journalist who was born and raised in Hungary and subsequently spoke with Marton, about the phone call from Wells. *Id.* Marton who has previously published two books about the Republic of Hungary and has written many articles about Hungary, affidavit of Marton page 2, informed Urban that she was planning to write a story concerning the current political developments in Hungary and was planning a trip to Budapest, Hungary. Affidavit of Urban page 2. Urban suggested that Marton contact Wells to see if Wells might help Marton obtain an interview of Dr. Antall for Marton's upcoming article. Affidavit of Marton page 3. Thereafter, Marton contacted Wells and they discussed the possibilities of Marton working on the proposed biography. Wells told Marton that he was primarily interested in finding a collaborator for the Dr. Antall's biography. Affidavit of Wells paragraph 16. Marton advised Wells that her only interest was interviewing Dr. Antall for an article about Hungary's political developments, and that she would not commit herself to collaborate on a biography. Affidavit of Marton page 4. Marton also informed Wells that she was unwilling to provide Wells with any compensation for any help that he may offer to get Marton the interview with Dr. Antall. *Id.*

Sometime in early 1990, Marton had contacted Ms. Elise O'Shaughnessy, the political editor of Vanity Fair, a magazine published by the defendant Conde Nast Publications, Inc. (hereafter "Conde Nast"). Affidavit of O'Shaughnessy page 1. Ms.

---

[1] While Defendant Marton filed a separate Motion to Dismiss the Amended Complaint or for Final Summary Judgment based on jurisdictional grounds (D.E. 10), she also adopted and incorporated by reference the grounds for dismissal or summary judgment set forth in the other defendants' motion (D.E. 12).

O'Shaughnessy indicated to Marton that Vanity Fair magazine would be interested in publishing an article written by her regarding recent social and political events in Hungary, but could not make any promises at this time. *Id.* On April 18, 1990, O'Shaughnessy faxed a letter to Wells confirming Vanity Fair's strong interest in Marton's article and asking him to assist Marton in her efforts to obtain an interview with Dr. Antall. Exhibit A of Affidavit of O'Shaughnessy. On April 19, 1990, Wells faxed a letter to O'Shaughnessy advising that he had a personal management agreement which granted him the exclusive rights to Dr. Antall's life story and that the agreement specifically included any and all interviews with Vanity Fair. Exhibit B of Affidavit of O'Shaughnessy. Wells faxed a second letter on April 19, 1990 to O'Shaughnessy which included a letter from a representative of Dr. Antall's political party which indicated that the party would be willing to assist Marton in obtaining an interview with Dr. Antall, but that Marton and Vanity Fair must agree to be "contractually bound" to an entity represented by Wells. Exhibit C of Affidavit of O'Shaughnessy. A third fax was sent on April 19, 1990 to O'Shaughnessy from Wells which stated as follows:

> Ms. Marton can have unrestricted access to Mr. Antall as well as introductions to third parties, locations, etc., which will help her story. The only caveat that is presented is that Ms. Marton will have to agree not to use any of the information gained in her personal discussions with Mr. Antall in any unauthorized biography of him at any time in the future. There are no further conditions on the project, of any kind.

Exhibit D of Affidavit of O'Shaughnessy. O'Shaughnessy forwarded a copy of all faxes received from Wells to Marton. Affidavit of O'Shaughnessy page 2. Upon review of the third letter faxed by Wells, Marton advised O'Shaughnessy that she would be willing to abide by the conditions proposed by Wells in that letter. Affidavit of Marton page 4; Affidavit of O'Shaughnessy page 3.

Wells sent an April 23, 1990 letter to O'Shaughnessy with a proposed agreement for Marton to sign. The proposed agreement from Wells was a highly restrictive agreement that went beyond the prior agreement contained in the third letter faxed by Wells to O'Shaughnessy. Affidavit of O'Shaughnessy page 3. Upon receiving the proposed agreement, Marton informed Wells that she could not sign the April 23, 1990 agreement for at least two reasons. First, she had no assurance that Vanity Fair would publish the article upon completion and second, the conditions of the letter were beyond the prior agreement and clearly unreasonably restrictive. Affidavit of Marton page 5.

Another letter was sent to Marton on April 24, 1990 from Wells asking Marton to sign a revised agreement which provided in part:

> You warrant and represent that in the event you are granted a private interview with Mr. J. Antall which shall appear in a magazine which shall first be approved by Mr. Antall or his duly authorized representatives: You agree not to publish, or allow to be published or used (except in any duly authorized interview) in any form, known or later discovered, any and all information gathered during or as a result of any such interview(s) granted to you by Mr. Antall or any third persons introduced to you by him or his authorized representatives.

Exhibit D of Affidavit of Marton. Again unsatisfied with the restrictions which were contrary to the April 19th communications, Marton informed Wells that she would not sign the April 24, 1990 restrictive agreement. Affidavit of Marton page 6.

An April 25, 1990 letter was sent to O'Shaughnessy which was also sent to Marton which stated in pertinent part:

> As a result of my conversations with you and Ms. Marton, it has been made clear to me that she does not wish to sign a legally binding document which will restrict her from using the material granted to her by Mr. Antall in any manner

which does not conflict with the uses that Mr. Antall has planned for the material. In addition, you have the informal agreement with Vanity Fair for a magazine story. Should that not be the ultimate use of the interview granted by Mr. Antall to her, Mr. Antall wishes to have the right to approve any and all such other uses of the interview to protect his reputation.

Exhibit E of Affidavit of Marton. Marton and O'Shaughnessy both thought that the above portion of the letter seemed to confirm that Dr. Antall had granted Marton an interview which could be used for her upcoming article on political developments in Hungary. Affidavit of Marton page 6; affidavit of O'Shaughnessy page 4.

Marton then wrote a letter directly to Dr. Antall in hungarian and sent it to a friend to deliver directly to Dr. Antall requesting an interview for use in her magazine article. Affidavit of Marton page 7. In addition, Marton asked a friend of her father's, who was a member of the Hungarian Smallholders Party as well as a family friend of Dr. Antall's, to help Marton obtain the interview with Dr. Antall. *Id.* at 8. Marton traveled to Hungary and planned to interview many other Hungarians, having no idea when she left whether Dr. Antall would grant her an interview. *Id.* On the last day of her trip, she received a call from one of Dr. Antall's aides advising her that Dr. Antall would meet with her that same day for a two-hour interview in Hungarian. *Id.* To the best of Marton's knowledge, Wells played no part in helping Marton obtain the interview. *Id.*

Thereafter, Marton wrote an article for Vanity Fair that included excerpts of her interview with Dr. Antall, as well as excerpts from other interviews and personal observations of Marton. *Id.* The article was later published by Vanity Fair and provided a detailed description regarding the political and social changes taking place in Hungary today. *Id.* The article was not a life-story or biography of Dr. Antall. *Id.*

On September 9, 1990, plaintiff filed a complaint against these defendants. On September 26, 1990, plaintiff filed an amended complaint stating a claim for tortious interference with an advantageous business relationship. Motions to Dismiss or alternatively for Final Summary Judgment were filed by the Defendants. Plaintiff also filed a Motion for Summary Judgment on the issue of liability against defendant Kati Marton. These motions as well as other discovery matters were referred to the Magistrate for an order or report and recommendation as appropriate.

At the scheduling conference on November 14, 1990 and in a jointly filed scheduling report signed by both parties filed November 19, 1990 (D.E. 27), the court was advised that the pending summary judgment motions were ripe for disposition and that a further factual development was not necessary. Thereafter, on December 3, 1990, plaintiff moved for an order permitting discovery in regard to the issue of personal jurisdiction over Marton (D.E. 35). The motion to permit discovery was referred to the Magistrate who denied such motion on January 25, 1991 (D.E. 48). Since the order today granting final summary judgment is not based on jurisdictional grounds, there can be no question that there was an adequate record developed on the issues decided today.

The Magistrate issued a scant report citing no case law in support of the recommendation that this court should grant final summary judgment in favor of defendants on the tortious interference of advantageous business relationship claim. The court's review of this matter followed.

## II. DISCUSSION

### A. *General Principles of Summary Judgment*

The standard applicable in reviewing a summary judgment motion is stated in Rule 56(c) of the Federal Rules of Civil Procedure:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law.

Only when there is no genuine issue of material fact may summary judgment be entered. Moreover, the moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

The Eleventh Circuit recently reviewed the summary judgment standards explaining that:

In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608; [*Environmental Defense Fund v.*] *Marsh,* 651 F.2d [983] at 991 [ (5th Cir.1981) ]. All reasonable doubts about the facts should be resolved in favor of the non-movant. *Casey Enterprises v. Am. Hardware Mutual Ins. Co.*, 655 F.2d 598, 602 (5th Cir.1981). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Marsh,* 651 F.2d at 991; *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir.1969). Summary Judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co.*, 420 F.2d at 1213. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Electronic [Techniques, Inc. v. Wackenhut Protective Systems, Inc.]*, 669 F.2d [1026] at 1031 [ (5th Cir.1982) ]; *Croley v. Matson Navigation Co.*, 434 F.2d 73, 75 (5th Cir.1970).

*Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1368–69 (11th Cir.1982).

The evidentiary standard to be applied in ruling on summary judgment motions was recently reviewed by the United States Supreme Court:

[The summary judgment] standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. (citation omitted).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id.* at 252, 106 S.Ct. at 2512.

Another recent Supreme Court case announced that a nonmoving party's failure to prove an essential element of a claim renders all factual disputes as to that claim immaterial and requires the granting of summary judgment:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Moreover, when the moving party "meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. *Avirgan v. Hull*, 932 F.2d 1572 (11th Cir.1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and

*Fed.R.Civ.P.* 56(e)). The evidence presented cannot consist of conclusory allegations or legal conclusions. *Id.* (citing *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).

### B. *Tortious Interference with Business Relationship*

█ A claim of tortious interference with business relationship requires proof of three essential elements: (1) existence of a business relationship under which the plaintiff has legal rights; (2) the showing of an intentional and unjustified interference with the relationship by the defendant; and (3) damage to the plaintiff as a result of the tortious interference with the relationship. *Gregg v. U.S. Industries, Inc.*, 887 F.2d 1462, 1473 (11th Cir.1989) (citations omitted). Applying the summary judgment standards to the above elements and the uncontroverted material facts of this case, necessitates our granting summary judgment in favor of all defendants. The court bases its ruling today not on element one, but on elements two above.

### 1. Plaintiff's Claimed Business Relationship with Dr. Antall

█ While the court does not base the ruling today on plaintiff's failure to show the existence of a business relationship in which plaintiff has legal rights, an essential element to which plaintiff would have the burden of proof at trial, a brief review of the lack of support for this essential element is further supportive of the granting of summary judgment. Wells asserts that such a business relationship exists based on various written documents included in the record. Wells claims that Peter Hauer, his authorized representative, entered into an agreement with Dr. Antall through Forum Rt., the internationally recognized commercial arm of Dr. Antall's political party the Hungarian Democratic Forum. A copy of the document declared to be between Peter Hauer and Forum Rt. (D.E. 49) is written in original German and dated April 9, 1990 (the English translation is included as exhibit E of Well's affidavit

D.E. 17). Besides Well's affidavit and allegations contained in his pleadings, plaintiff has not submitted any other affidavits or additional written evidence confirming the claimed relationship with Dr. Antall. Plaintiff himself recognized this deficiency when he stated at oral argument before the Magistrate that "he has been unable to secure written evidence memorializing his claimed relationship with Mr. Antall." Page 3 of the Magistrate's Report (D.E. 50).

The relevance and scope of the "Agency Agreement" dated March 14, 1990, asserted to be a contract between Peter Hauer and Wells is also unsupportive of plaintiff's claimed relationship with Dr. Antall. Copy of document, exhibit A of Well's Affidavit. Plaintiff Well's avers that this alleged binding contract is "an exclusive agreement for the life story rights of Dr. Antall in the United States of America." Paragraph 6 of Well's Affidavit. In as much as Marton's article was aimed toward the current political developments in Hungarian government and admittedly not a life story of Dr. Antall, the agreements included in the record are largely irrelevant.

### 2. Intentional and Unjustified Interference

Defendants claim that, as a matter of law, plaintiff cannot establish a tortious interference with an advantageous business relationship, in that there was no *intention* by Marton or any of the other defendants to interfere with any relationship, and that, in any event, her actions or the actions of the other defendants were not unjustified. The court agrees with defendants position; Wells has completely failed to present any evidence of intentional and unjustified interference on the part of any of the defendants.

Defendant Marton states that she had no intention of interfering with any contractual relationship or other relationship between Dr. Antall and Wells, that she had no information suggesting that the interview would constitute any such interference, and that she had no intention of inflicting any harm on Wells. Affidavit of Marton page 9. Marton's "sole interest in

interviewing Dr. Antall was to obtain and to disseminate important information regarding Dr. Antall's vision for the future of Hungary at this critical point in history." *id.* In fact, after receiving the April 25, 1990 letter from Wells, Marton's impression was that Wells agreed that as long as the article with Vanity Fair was the ultimate use of any interview with Dr. Antall, Dr. Antall would grant her an interview. Affidavit of Marton page 6.[2] Similarly, the corporate defendants represent that they had no intentions to interfere with any relationship or any personal knowledge surrounding Marton's interview with Dr. Antall. Affidavit of O'Shaughnessy paragraphs 11–14; Affidavit of Urban paragraphs 10–12.

■ Plaintiff has not come forward with sufficient evidence to rebut the above showing of complete lack of intentional and unjustified interference. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Without a showing sufficient to establish the existence of intentional and unjustified interference, an element essential to plaintiff Wells' case, on which he will bear the burden of proof at trial, this court must grant summary judgment on plaintiff's claim for tortious interference with business relationship.

### 3. Damages

While we do not rest our hat on plaintiff's failure to show any damages in this case, the court must point out that there is no evidence of damage to Wells as a result of the alleged tortious interference. There is simply no claim against any of the defendants.

For the above reasons, defendants' motion for summary judgment on plaintiff's

claim for tortious interference with business relationship is hereby *granted.*

DONE AND ORDERED.

---

2. It is also undisputed that while Marton did not agree to the subsequent request for restrictions on the article, the restrictions were in fact honored. Neither party has produced any evidence that the magazine piece in question was published in any other magazine or other publication.