[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Finding of Facts
1. Plaintiff Westport Taxi Service Inc. ("Westport Taxi") is a Connecticut corporation that from 1969-78 provided taxi services in the Westport and Weston, Connecticut areas pursuant to a certificate of public convenience and necessity issued by the Connecticut Public Utilities Commission ("PUCA"). [T. 107-10] CT Page 4956
2. Plaintiff's taxi business was originally purchased in 1955 by John Gilbertie, Sr. for $35,000 and operated as a proprietorship under the name Westport Taxi Service. [T. 106]
3. The business was incorporated in its present form in 1968, and the previously issued certificate of public convenience and necessity was reissued to the corporation at that time. [T. 108-09]
4. Defendant Westport Transit District was formed in 1969, apparently pursuant to General Statute Section 7-273b. [T. 119]
5. Throughout its years of operation, plaintiff's taxi business was a family-owned operation run by John Gilbertie, Sr., and his two sons, Michael Gilbertie and Anthony Gilbertie. In the mid-1970's, Anthony Gilbertie owned 50 percent of the corporation's stock and served as president of the corporation. Michael Gilbertie owned the remaining 50 percent of the corporation and served as vice-president. Until his death in 1977, John Gilbertie, Sr., also served as an officer of the corporation. [T. 106-06]
6. In addition to managing the business, the Gilberties participated in its operation, in particular regularly acting as dispatchers. [T. 116] In the 1970's, plaintiff had fifteen employees in addition to the Gilberties. [T. 115]
7. In the mid-1980's and at all times relevant hereto, plaintiff operated its taxi services in Westport and Weston pursuant to a combined certificate of public convenience and necessity issued by the PUCA pursuant to General Statutes section 16-320 (Now section 13b-97). [T. 327-28; Pl. Ex. 28, 29] Pursuant to its certificate, plaintiff was permitted to provide three types of service: Premium ride service (involving transportation of a single fare), shared ride service (involving transportation of multiple fares), and package delivery. [T. 108-110]
8. The PUCA had also, during this timeframe, issued a certificate of public convenience and necessity to another private taxi company in Westport, Teddy's Westport Taxi, Inc. ("Teddy's Taxi") which had authority to operate cabs in Westport. [Pl. Ex. 1]
9. According to Mr. Cumpstone's testimony, pursuant to a regulation promulgated by the PUCA, a taxi cab was permitted to provide shared ride service (i.e., transport more than one fare at a time) if the first fare did not object. As interpreted and administered by the PUCA, such shared ride service was permitted without requiring affirmative inquiry of the first passenger by CT Page 4957 the taxi driver, so long as the first passenger did not express opposition. [PUCA regulation Section 16-319-15; T. 244-45, 278-79]
10. In the 1970's, over 50 percent of plaintiff's business was shared ride, which was coordinated by means of a dispatcher. [T. 749] In fact, in the early 1970's, 99 percent of the business was shared ride. [T. 111]
11. Pursuant to its certificate, plaintiff charged rates under a zone system, with the zones emanating from the Westport train station and from plaintiff's office in the center of town. Teddy's Taxi applied the same rate system. [T. 180]
12. When plaintiff provided shared ride service, it was permitted to charge each fare sharing the ride the full zone fare. [T. 111]
13. Throughout the period of plaintiff's taxicab operations, the PUCA regulated taxi services in all Connecticut localities pursuant to General Statutes Sections 16-319 et seq. [T. 13]
14. Pursuant to General Statutes Section 16-320, no person, association or corporation was allowed to operate a taxicab without obtaining a certificate of public convenience and necessity from the PUCA. [T. 18]
15. Issuance of such certificate represented a finding by the PUCA that operating the number of taxicabs permitted under the certificate was for the public convenience and necessity. [T. 19]
16. Ownership of such certificate, furthermore, granted a taxicab operator the right to be free of competition absent a finding by the PUCA that such competition was for the public convenience and necessity. [T. 20]
17. Under its statutory authority, General Statutes Section 16-319, the PUCA established the number of vehicles allowed to operate and the exact rates allowed to be charged within a given locality. [T. 14-18]
18. Pursuant to its statutory authority, the PUCA required all operators within a given locality to charge the same rates in accordance with its regulatory philosophy that competition among taxi operators was to be with regard to quality of service rather than price. [T. 15-16]
19. In approving numbers of vehicles and rates for a CT Page 4958 given locality, the PUCA took into consideration whether, given the number of vehicles, the rate structure would permit a reasonable return on investment to the operator while remaining consistent with the public's convenience and necessity. [T. 14-18]
20. The PUCA did not permit taxicab operators to charge below-cost rates. [T. 25]
21. As of April 1977, the last fare increase that plaintiff had requested and was granted dated to a decision of the PUCA on September 15, 1970. [T. 6; Pl. Ex. 1]
22. Under the September 15, 1970, decision, plaintiff and Teddy's Taxi were permitted to charge $1.70 for a three mile one way trip, the average distance of a taxicab ride within a town. [T. 30; Pl. Ex. 1]
23. Beginning in the fall of 1975, plaintiff (and all other taxi companies in Connecticut) were permitted to charge an additional ten cents per fare in accordance with a statewide gas surcharge approved by the PUCA in light of rising gasoline costs. [T. 31; Pl. Ex. 2]
24. Thereafter plaintiff's rate for a three mile one way trip was $1.80. [T. 31; Pl. Ex. 1 and 2]
25. Although plaintiff's operating costs had increased from 1970 to 1973, plaintiff chose not to seek a fare increase in 1973, because defendant Westport Transit District planned to initiate a federally funded "Minnybus" fixed-route bus service throughout Westport, which, plaintiff anticipated, would significantly affect plaintiff's ridership. [T. 117-23]
26. In August 11, 1974, defendant instituted its Minnybus service. Consequently, plaintiff again decided against seeking a rate increase in 1974. [T. 123]
27. The implementation of defendant's "Minnybus" service adversely affected plaintiff and Teddy's Taxi's ridership and revenues. [T. 123]
28. In April 1975, in order to alleviate the impact of defendant's Minnybus service, plaintiff expanded its operations within Westport by beginning to meet trains arriving at the Westport train station to solicit passengers, a service it had not previously offered. [T. 131]
29. As a result of its meeting the trains, plaintiff's revenues in 1976 increased over its revenues in 1973 and 1974 CT Page 4959 before the Minnybus started. [T. 137]
30. Defendant's implementation of its Minnybus service, while initially affecting plaintiff's profitability, did not ultimately cause plaintiff to go out of business. Plaintiff was able to make up for its lost revenues from the Minnybus by expanding operations, although plaintiff's increase in revenues was at the expense of Teddy's Taxi, which previously had not had competition for passengers at the railroad station. [T. 130-35]
31. Plaintiff and Teddy's Taxi complained to defendant about the deleterious effects defendant's Minnybus service was having on their business. [T. 125-25]
32. In response to complaints by the private taxi operators in Westport in 1974 about the effects of the Minnybus, defendant applied for federal funding from the Urban Mass. Transportation Authority (UMTA] in January 1975 to undertake a study to determine how to remedy the deleterious effects of defendant's Minnybus operation on Westport's private taxi business. Defendant received federal funding of $25,000 to conduct the study, pursuant to a grant contract with UMTA. [T. 125-130, 541-48; Pl. Ex. 11, 12, 34]
33. Plaintiff and Teddy's Taxi cooperated in the study, making their records and books available for inspection and providing information recording their operations, including equipment and employee information, trip data, operating and capital costs, revenue data, and ridership data. [T. 128-130, 544; Pl. Ex. 11, 12]
34. The study concluded that the two existing taxi companies were averaging together between 200 and 220 customer trips per day. [Pl. Ex. 35 at A9; T. 578]
35. The study further concluded that the fare schedule under which the two companies were operating had not risen in the 1970's in step with inflation and that the companies were, as a result, subsisting at a marginal level. [Id.]
36. As a result of the study, defendant decided to apply for a further grant from UMTA for a demonstration project to implement a proposed "paratransit" system throughout Westport integrating all bus and taxi services under the aegis of the District. [Pl. Ex. 35; T. 548]
37. In its application to UMTA, defendant stated its intention to provide within the proposed paratransit system shared ride taxi service, premium ride taxi service and package delivery, coordinated through a single dispatch center operated CT Page 4960 by defendant. [Pl. Ex. 35 at A16; Pl. Ex. 36 at 2; T. 569-79; see Pl. Ex. 13 at 2 paragraph A; T. 152-55]
38. In its application to the federal government, defendant further represented that it intended to replace the existing private taxi operations in the town of Westport. [T. 570; Pl. Ex. 35 at B2] It intended to exercise its statutory authority to assume the regulatory powers of the PUCA for the Westport area under General Statutes Section 7-273d, including but not limited to fixing rates. [T. 567-68, 562, 577; Pl. Ex. 35 at A10]
39. In particular, defendant represented in its application to the government that it intended to take away the existing private companies' certificates of public convenience and necessity and issue them limited certificates no longer permitting them to offer shared ride service. [T. 575-77; Pl. Ex. 35 at B2-B3]
40. Defendant also represented that it intended to eliminate the separate dispatching services of the existing taxi companies and require them to use dispatching services provided by the District. [T. 567, 576-77; Pl. Ex. 35 at B4]
41. Defendant recognized that if it eliminated the existing companies' right to offer shared ride service, it was required to compensate them. [T. 577, 578]
42. Defendant further represented that for the first year of its proposed operations it would offer the contract to provide shared ride services to one of the two private taxi companies then operating in Westport. [Pl. Ex. 35 at B2-B3; T. 575-76]
43. As reflected in its application, defendant planned to operate at below cost, projecting losses of $284,000 for its first year of operation and $283,000 for its second year. [Pl. Ex. 35 at C10; T. 605]
44. At the time of its application, defendant recognized that its proposed rates would be lower than those that plaintiff was permitted to charge by the PUCA. [T. 583, 585]
45. As represented in its application, defendant intended to take over all the taxi business in Westport. In particular, defendant intended to assume the total current ridership of the two existing companies, which was between 200 and 220 trips per day, then increase it to 225 trips per day within three to six months, 250 trips by nine months and 300 trips by the end of the project. [Pl. Ex. 35 at B14, B19; T. 580-82, 588-89] CT Page 4961
46. Defendant's representations in its application about its intended involvement of the existing private taxi companies in its proposed project and of its intended treatment of their existing franchise rights was critical to defendant's ability to obtain federal funding, since the federal government, specifically UMTA, was concerned about protecting existing private operations from adverse effects of federally subsidized transit programs. [T. 561-64]
47. During the course of conversations subsequent to the completion of defendant's study, Richard H. Bradley, then defendant's executive director, informed the Gilberties of the District's plans to establish a taxi service. [T. 137-151]
48. In particular, Mr. Bradley informed the Gilberties of the District's plans to eliminate plaintiff's business by taking plaintiff's certificate of public convenience and necessity and to have the Gilberties work for the Transit District as salaried employees. [T. 138-40]
49. At no time did Mr. Bradley or anyone else on behalf of the Transit District ever offer to compensate plaintiff for the proposed destruction of its business or for the intended elimination of its certificate or infringement with plaintiff's franchise rights. [T. 150]
50. When asked by Mr. Gilbertie how the District could away these certificates protected by the PUCA, he responded that they don't have to abide by PUCA regulations and that the District would do what it wants. [T. 150-51]
51. When the Gilberties expressed their unwillingness to give up their own business without compensation and their desire to remain independent businessmen, Mr. Bradley stated, "We are going to run this thing at below cost fares. You can't compete with us." [T. 150] "We are going to put you out of business, you are going to go out of business." [T. 142]
52. The District knew that the private taxi companies would not be able to compete with its proposed below-cost rates and further knew and intended that they would be put out of business by Maxytaxy. [T. 142, 150, 580-82, 585, 587-89]
53. It was the intention of the District, as expressed by Paul Green, then one of the District's directors, to implement a below-cost subsidized taxi system in Westport, to try to get existing commuters to take the District's Maxytaxy, to eliminate competition; and then, once private competition had been eliminated, to raise rates so that the system would not need CT Page 4962 subsidies to continue operations. [T. 588-91]
54. In the summer of 1976, UMTA approved a grant of $635,000 to fund defendant's demonstration project. [Pl. Ex. 36 at 3]
55. During the fall of 1976, defendant solicited bids for its proposed demonstration project, advising potential bidders in the bid package that its project would include shared ride, premium ride and package delivery services. [Defendant's Exhibit 7 at 2]
56. In December 1976, defendant executed a contract with the federal government for implementation of its proposed demonstration project, including Maxytaxy. Pursuant to the contract, defendant expressly agreed that it would comply with the terms of its application. "The project: The public body agrees to undertake, carry out and complete the project described in its application filed with, and approved by, the government as modified, and herewith incorporated by reference, and in accordance with the terms and conditions of this contract." [Pl. Ex. 37 at section 1]
57. In early 1977, Robert L. Cumpstone, then motor carrier investigator for the PUCA, site-visited Westport's private taxi operators and defendant Transit District to investigate a complaint by the taxi operators that the District intended to operate taxicabs without authority from the PUCA. [T. 242]
58. As a result of his investigation, Mr. Cumpstone concluded that the Transit District intended to provide substantially the same service as that provided by the private taxicab operators. [T. 244-250
59. In particular, Mr. Cumpstone determined that the District's proposed services constituted "demand response transportation," the indicia of tax; service under the taxicab statutes and PUCA regulations. [T. 246-48]
60. The PUCA concluded, however, that although the Transit District's proposed services involved taxi service, the District was exempt from regulation by the PUCA under General Statutes Section 7-273b(g). [T. 249-50]
61. Had the Transit District been a private carrier seeking PUCA approval for its Maxytaxy services, it would not have obtained permission from the PUCA to operate the number of vehicles it proposed, because Westport's population and the public necessity for taxi services in Westport did not justify CT Page 4963 the proposed increases in tax: services. [T. 252-54]
62. Had defendant been a private taxi operator, furthermore, the PUCA would not have approved defendant's rates for Maxytaxy, which were below cost and below existing fares. [T. 254-55]
63. In April 1977, defendant instituted its Maxytaxy services. [Pl. Ex. 14, 15, 17]
64. Defendant did not comply with the terms of its application to the federal government in breach of its contract with UMTA in the following respects: A, it did not assume the regulatory powers of the PUCA over taxi services in Westport, an act which would have provided plaintiff the right to appeal defendant's actions in operating Maxytaxy to the PUCA. [T. 565-66]
B, it failed to go forward with the elimination of plaintiff's existing certificate or with reissuance of a new limited certificate, acts which would have required defendant to pay compensation to plaintiff for acquisition of plaintiff's certificate of public convenience and necessity and the issuance of a new limited certificate. [T. 572]
C, it allowed a newly formed company, Westport Transport Corporation, to bid on the contract for shared ride services and awarded the contract to that company at the outset. [T. 575-76, 592-95]
65. Defendant's Maxytaxy services included shared ride services and package delivery. [T. 159-60, 165-67; Pl. Ex. 14, 15, 17] In addition, defendant provided premium ride services to segments of the Westport community. [T. 584; Def. Ex. 7 at 2]
66. Defendant's Maxytaxy services constituted demand response transportation, competing directly with plaintiff's taxi services for the same passengers. Like plaintiff, defendant provided door-to-door service, which it coordinated by means of a dispatcher, and met passengers at incoming trains. As with plaintiff's service, if a single passenger requested taxi service, a cab would be dispatched and, if no other customers were available, door-to-door premium ride services were provided. [T. 165-67]
67. Maxytaxy's rates were below those plaintiff was required to charge by the PUCA. [T. 172-84; Pl. EX. 16] Thus, for example, whereas under its zone system Maxytaxy would charge $1 for a ride within Zone 13, plaintiff would be required to charge $1.80 for the same ride. [T. 174-75] In addition, CT Page 4964 Maxytaxy did not permit tipping in its vehicles, the usual practice in plaintiff's taxicabs. [T. 161-62]
68. In addition, defendant offered special discounts (Up to 50 percent), which were based on annual passes for non-commuter adults, commuters, single children, the elderly, the handicapped, college students and families. [Pl. Ex. 16; T. 176-77]
69. During the first two years of its operations, Maxytaxy operated substantially below cost, spending two dollars in non-capital operating costs for every dollar it received in revenue. [T. 604-05; Pl. Ex. 10]
70. As defendant's month ridership statistics indicate, Maxytaxy's ridership increased from 1,458 in April 1977 to 11,319 in January, 1978. [Pl. Ex. 18] During the same period, plaintiff's ridership dropped. [T. 188]
71. In July 1977, plaintiff was forced to eliminate its nighttime operations as a result of defendant's Maxytaxy below-cost service, which rendered them unprofitable. [T. 188]
72. Defendant instituted its below-cost fares with the intent to eliminate competition from private taxi operators in the Westport area and with the intent to replace the existing taxi companies and thereby to attain monopoly power over the taxi business in the Westport area. [T. 142, 150, 580-82, 585, 587-89]
73. In particular, defendant knew that its below-cost fares would damage the business of existing taxi operators and drive them out of business and specifically intended its pricing policy to do so. [Id.]
74. Defendant intended, once it had obtained monopoly power, to raise its rates so that it would no longer need government operating subsidies. [T. 711-14]
75. After defendant's institution of Maxytaxy, it was not possible for plaintiff to run a profitable business based exclusively on the provision of premium ride service, since premium ride services constituted less than 50 percent of its business. [T. 735]
76. It was also not possible for plaintiff to run a profitable business on the basis of shared ride service because plaintiff could not compete with the fare structure of defendant's Maxytaxy. [T. 735-36] CT Page 4965
77. As a result of competition from defendant's Maxytaxy, plaintiff was forced to close down its taxi operations in May, 1978. [T. 375-77]
78. Teddy's Taxi had closed down its taxi operations one month earlier. [T. 373]
79. Because plaintiff was not able to operate a profitable taxi business after the institution of Maxytaxy, plaintiff's decision to terminate its taxi operations was a reasonable business decision. [T. 376-77]
80. In 1978, after it had driven the two private taxicab companies out of business, defendant increased its rates 28 percent consistent with its original intention to operate at subsidized below-cost rates in its first two years in order to attract ridership, and subsequently increase its rates. [Pl. Ex. 10; T. 711, 713-14] Defendant, thereafter, continued to increase its rates, recognizing that it required 30 to 40 percent higher rates at a 20 percent reduction in costs to operate profitably. Thus, for example, defendant more than quadrupled the cost of its annual pass from $50 to $220. [T- 710]
81. In September, 1978, Theodore Wisniewski purchased the rights to operate livery services from Teddy's Taxi. Mr. Wisniewski concurrently obtained the right to run an Avis Rent-A-Car agency and Teddy's Taxi's then defunct right to operate taxicabs. [T. 681-83]
82. Thereafter, the town of Westport required Mr. Wisniewski to operate two taxicabs to service out of town taxi customers. [ID. 684-85]
83. In the fall of 1978, Teddys two taxicabs totaled, on average, 20 rides each day, with ten of those rides within Westport. [Pl. Ex. 10; T. 74-75, 686]
84. From 1978 through 1981, Teddy's Taxi's two-cab service operated at a substantial loss as a result of competition from defendant's Maxytaxy. [T. 687; Pl. Ex. 9 at 2]
85. In 1981, the PUCA conducted a hearing on an application for a rate increase by Teddy's Taxi. The PUCA concluded that "the Transit District's vehicle operations have effectively destroyed the taxi's normal market for taxi service." The PUCA further concluded that Teddy's Taxi's "normal taxi market had been severely impaired by the below cost transportation services provided by the Westport Transit District" and allowed Teddy's to increase its rates to $2 for CT Page 4966 the first mile and ten cents for each additional 1/10 of a mile. Under the new fares, Teddy's was permitted to charge $4 for a three mile one way trip.
86. Between 1970 and 1977, taxi companies in localities in Fairfield County other than Westport sought and obtained rate increases from the PUCA. [T. 32-60; Pl. Ex. 3-8]
87. In particular, taxi companies in Bridgeport, Stamford and Greenwich obtained fare increases from the PUCA between 1975 and 1977 that resulted in fares substantially higher (by approximately 50 percent) than plaintiff was permitted to charge in 1976-77. (T. 32-60; Pl. Ex. 1-8]
88. From 1976 to 1978, plaintiff made a business decision not to seek a rate increase from the PUCA because of the upcoming implementation and actual implementation of the Maxytaxy and the need to compete with Maxytaxy's below-cost fares. [T. 235-36]
89. Plaintiff's decision not to seek a fare increase from 1976 to 1978 was a reasonable business decision. [Id.]
90. Had plaintiff tried to implement increased rates in Westport in competition with Maxytaxy, plaintiff would not have been able to compete because Maxytaxy was charging fares below cost and below those currently charged by plaintiff. [Id.]
91. In 1976, the average fare that taxi companies in Bridgeport, Greenwich and Stamford were permitted to charge for a one way three mile trip (the distance deemed by the PUCA to be average for a trip within city limits) was $2.70. [T. 32-60; Pl. Ex. 3, 5, 8, 24]
92. Under the fare structure in place in Westport, plaintiff was permitted to charge $1.80 for a one way three mile trip. [Pl. Ex. 1 and 2]
92. In deciding whether to approve a rate application, the PUCA reviewed rates in comparable localities. The PUCA also considered the profitability to the taxicab operator that would result from the rate structure requested. [T. 14-18; 33-35]
94. Bridgeport, Stamford and Greenwich were comparable localities that the PUCA would have considered in approving rates for Westport. [T. 37-38]
95. In setting rates, the PUCA considered a ratio of operating costs to gross revenue of between 85 percent and 95 percent to be appropriate, that is a return of between five CT Page 4967 cents and fifteen cents on every dollar of gross revenue, with ten cents on the dollar preferred. [T. 21, 322-24]
96. In determining whether a proposed rate structure would result in a net operating ratio of between 85 percent and 95 percent, the PUCA treated the portion of officers' salary which represented compensation for services contributed to the operation of the business, such as dispatching services, as operating costs and considered the remainder profit. [T. 21-22]
97. Throughout the period of plaintiff's operations, Michael Gilbertie and Anthony Gilbertie served as dispatchers for plaintiff. [T. 204]
98. To determine the profitability of plaintiff's taxi operations, it was necessary for the PUCA to deduct from plaintiff's officers' salaries an approximate amount presenting the cost of hiring dispatchers. [T. 48-49; Pl. Ex. 23]
99. Between 1974 and 1977, dispatchers received salaries slightly above minimum wage. [T. 204-06; 305-06]
100. In 1974, if plaintiff had hired dispatchers it would have been required to pay approximately $2.50 an hour in dispatching salary, totaling $17,290 for the year. [T. 206; Pl. Ex. 23]
101. In 1975, if plaintiff had hired dispatchers, it would have been required to pay approximately $18,200 in dispatching salary for the year. [T. 207; Pl. Ex. 23]
102. In 1976, if plaintiff had hired dispatchers, it would have been required to pay approximately $20,000 in dispatching salary for the year. [T. 207; Pl. Ex. 23]
103. In 1977, if plaintiff had hired dispatchers, it would have been required to pay approximately $16,714 in dispatching salary. [T. 206-07; Pl. Ex. 23]
104. When the value of plaintiff's dispatching services is subtracted from plaintiff's 1977 net operating revenue, plaintiff made a profit of $5,759.12 in 1977. [Pl. EX. 23.]
105. Plaintiff's net operating profits in 1977 were substantially impaired by defendant's operation of Maxytaxy. [T. 334-35]
106. Had there been no competition from Maxytaxy and had plaintiff obtained a fare increase comparable to the fares in effect in Bridgeport, Greenwich and Stamford in 1976 and 1977, CT Page 4968 its revenues and expenses for 1977, based on its actual ridership in 1977, would have resulted in approximately the figures set forth in Pl. Ex. 25 and 26. [T. 331-60]
107. This means that fare increases to rates comparable to those in effect in Bridgeport, Greenwich and Stamford in 1976 and 1977 would have yielded plaintiff an adjusted operating profit of $23,385, deducting the reasonable value of dispatching services but including officers' salaries. [Pl. Ex. 26]
108. But for the advent of defendant's below-cost Maxytaxy service, which prevented plaintiff from obtaining fare increases comparable to those granted by the PUCA to similarly-situated taxi companies in other localities, plaintiff's franchise including the canteen/lottery revenue would have realized a net profit of approximately $23,385 in 1977, after allowing for the purchase of new vehicles and making appropriate allocations of officers' claims to profits and employee services. [Pl. Ex. 26]
109. An adjusted 1977 profit of $23,385 over an adjusted revenue of $176,587 would equal a return of 13 cents on every dollar of revenue. This return is equivalent to a net operating ratio of 87 percent which was well within the range the PUCA deemed appropriate. [Pl. Ex. 26]
110. If the revenues of $5,482, from the canteen/lottery, were subtracted (or just not added in) there would be an adjusted 1977 profit of $17,903 over an adjusted revenue of $171,105 which would equal a return of approximately 10 1/2 cents on every dollar of revenue. This equals a net operating rate of 89 1/2 percent, also well within the range the PUCA deemed appropriate.
111. Had plaintiff sought to bring its rates to the same level as those permitted to be charged in Bridgeport, Stamford and Greenwich, the PUCA would have granted its application. [T. 59]
112. For purposes of damage calculation in this case, it is appropriate to subtract the canteen/lottery portions of the revenue which could have been attributable to the car rental business as well. Moreover, that figure — which is $5,482 — was not submitted as part of the PUCA filings and was then not considered as part of any rate increase request.
113. As a result of the competition from Maxytaxy, plaintiff suffered lost profits from April 1977 to May 1978 in the amount of $12,144. ($17,903 — $5,759; 1977 adjusted profit minus actual profit) CT Page 4969
114. An appropriate return on investment sought by an investor purchasing plaintiff's taxi business in 1976-78 would have been approximately 10-12 percent. [T. 363-64]
115. Had it not been for defendant's implementation of its below cost Maxytaxy service, which prevented plaintiff from obtaining fare increases comparable to those granted by the PUCA to similarly situated taxi companies in other localities, plaintiff's taxi franchise would have been worth in the range of $149,131.99 to $179,030.00 in 1978. [Pl. Ex. 23; T. 364; with adjustment for canteen/lottery revenue as contained in Paragraphs 110-112 above]
116. By virtue of the defendant's operation of the Maxytaxy, the value of the plaintiff's profitable taxi franchise was destroyed, causing plaintiff to suffer between $149,131.99 and $179,030.00 in damages. [Id.]
117. Plaintiff's total actual damages resulting from defendant's operation of the Maxytaxy equal between $167,034.99 and $196,933.00 not including pre-judgment interest, attorneys' fees and costs. [Pl. Ex. 26, 27, again, in conjunction with adjustment of canteen/lottery revenue]
 CONCLUSIONS OF LAW LIABILITY
The evidence of defendant's intentional anti-competitive conduct for the improper purpose of obtaining monopoly power over taxi services in Westport is overwhelming. The written and testimonial evidence at trial established defendant's intention to create a monopoly, its implementation of below-cost pricing to acquire the entire taxi customer base in Westport, and its knowledge that its pricing policy would drive plaintiff (and the other private taxi company in Westport) out of business.
First, the defendant's intention to establish monopoly over taxi services in Westport was explicitly set forth in defendant's application to the federal government for federal funding. Defendant knew, as a result of its 1975 study of the taxi business in Westport, that the entire customer base was 200-220 customer rides per day. Defendant's application to UMTA makes clear its intention to implement a below-cost pricing system ("reduced zone fare structure") to acquire all of that customer base within three to nine months:
 Currently, the total average daily level of trip making by taxi within Westport ranges from 200 to 220 trips per day. . . . It is anticipated CT Page 4970 that a small part of this market will be lost due to increased fixed route commuter service. This should be off set, however, by the new demand which will be generated by the reduced zone fare structure, discounts to annual passholders at selected times and locations, and the extensive system marketing program to be undertaken.
. . . .
 It is conservatively anticipated that the slight drop in the level of ridership to 200 passengers per day may occur in the first three months of the new services, but that daily ridership averaging 225 trips/day will be realized 3-6 months after implementation of service, 250 trips/day after 9 months and better than 300 trips per day by the end of the Demonstration.
[Pl. Ex. 35 at B14, B19].
The application expressly stated defendant's intention to replace the existing private taxi companies completely:
 A fully integrated taxi service will offer premium ride, shared-ride, and small package delivery services within the Town of Westport using a single fleet of dynamically controlled vehicles. This service will be provided by a single operator who is operating under contract to the Westport Transit District, and will replace all existing intra-Westport service offered by the two existing taxi companies.
[Id. at A10 (emphasis added)]. Paul Green, one of the Transit District's directors in 1978, confirmed at trial that this was, in fact, the intention of the District. [T. 580-81]. Defendant's own documents also establish that its implementation of a markedly below-cost pricing system was geared to obtain customers, and that once competition from the private companies had been eliminated, a substantial increase in fares would be necessary. Thus, defendant's own analysis of its fare structure over the first two years of operation indicates defendant's non-capital operating costs were $12.00 per operating hour per taxi as against revenues of only $6.00 per operating hour, literally a 50% below-cost pricing structure. [Pl. Ex. 38 at 2, T. 616-17]. In 1978, however, after the two private taxi companies in Westport had gone out of business, defendant raised CT Page 4971 its rates 28%. [Pl. Ex. 38 at 2]. Indeed, defendant quadrupled the cost of its annual pass from $55.00 to $220.00 per year and raised other rates after 1978 in an effort to meet costs. [T. 710]. As Samuel Goodman, defendant's present Executive Director testified at trial, defendant's intention from the outset was to utilize its below-cost pricing to obtain customers and then, in the third year of operations, raise prices to eliminate operating losses. [T. 711-14; Pl. Ex. 10].
Defendant undeniably knew that plaintiff could not, legally or financially, match its below-cost fares. As a matter of law, plaintiff's fares were mandated by the PUCA, and plaintiff was barred from charging lower fares to compete with the fares charged by Maxytaxy. [T. 583, 585]. As a practical matter, defendant's study of Westport's taxi business had demonstrated that the existing fares had not kept pace with inflation and were already insufficient to enable the private companies to thrive. [Pl. Ex. 35 at A9]. It was undeniably clear to defendant that plaintiff could not survive even had it been able, legally, to charge defendant's discount rates.
Green admitted at trial that the District knew that its rates were below cost, were below those mandated by the PUCA and that the private companies could not match the rates. [T. 583]. He further conceded at trial that the District knew that the Maxytaxy would damage the existing companies and that the District's intention was to replace them as the sole providers of taxi business in Westport. [T. 595-99]. As Richard Bradley, defendant's Executive Director at the time, stated to the Gilberties, "we are going to run this thing at below cost fares. You can't compete with us." [T. 150]. "We are going to put you out of business, you are going to go out of business." [T. 142].
The indisputable evidence thus demonstrates:
 defendant's intention to obtain a taxi monopoly in Westport;
 defendant's intention to obtain that monopoly by substantially below-cost pricing which it knew plaintiff could not match and intended would drive plaintiff out of business;
 defendant's implementation of such below-cost pricing until plaintiff was, in fact, out of business;
 defendant's acquisition of monopoly power over the taxi business in Westport by virtue of such predatory pricing and; CT Page 4972
 defendant's sharp increase in fares once monopoly power had been obtained.
As a result of the conduct, as set forth above, defendant is liable to plaintiff for plaintiff's lost profits and the destruction of plaintiff's taxi business because defendant's conduct in implementing the Maxytaxy violated Connecticut's antitrust laws. See Connecticut General Statutes 35-24, et seq. The fourth count of plaintiff's amended complaint seeks recovery for such violations.
 Defendant's Conduct Violated Connecticut's Prohibitions on Monopolization and Attempt to Monopolize.
Defendant's conduct constituted a clear violation of 35-27
of Connecticut's Antitrust Act. Section 35-27 provides, as follows:
 Monopolization or attempt to monopolize unlawful
 Every contract, combination, or conspiracy to monopolize, or attempt to monopolize, or monopolization of any part of trade or commerce is unlawful.
The statute, thus, creates "three separate offenses:
 1. `contract, combination or conspiracy to monopolize';
2. `monopolization'; and
3. `attempt to monopolize.'"
Shea v. First Federal Savings Loan Ass'n. of New Haven,184 Conn. 285, 304 (1981). The law is clear that only the first of these three offenses requires a plurality of actors. Id. Plaintiff submits that defendant's conduct constituted a violation of the second and third of these offenses.
a. Monopolization
 The elements of the offense of monopolization are:
1. the possession of monopoly power in the CT Page 4973 relevant market; and
 2. the willful acquisition of maintenance of monopoly power.
Shea, 184 Conn. at 304.
Monopoly power is the power to control prices or exclude competition with respect to a particular product and within a particular geographic area. Id.; United States v. Grinnell,384 U.S. 563, 571 (1966).
By May 1978, defendant indisputably possessed monopoly power over taxi services in the Westport area — the "relevant market" for antitrust purposes. After plaintiff was forced to close its taxi business in May 1978 as a result of defendant's below-cost operations, defendant controlled over 95% of the taxi market in Westport. Teddy's Taxi, which resumed operations in late 1978, was the defendant's only remaining competitor. It operated only two taxicabs at an average of 20 rides per day (as against 400 rides per day provided by defendant), only 10 of which were within Westport. [Pl. Ex. 10; T 74-75, 686]. Between 1978 and 1981, Teddy's Taxi operated at a substantial loss. [Pl. Ex. 9 at 2, T. 687].
The existence of monopoly power will be found where the defendant is shown to control the predominant share of the relevant market. Grinnell, 384 U.S. at 571. A market share of 85% or higher is strong evidence of the existence of monopoly power. Id. (87% market share constitutes monopoly power); United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945) ("Alcoa") (90% share of relevant market constitutes monopoly power).
In this case, where defendant provided approximately 12,000 fares per month and literally dominated the Westport market for taxi services, it is clear that it possessed monopoly power. As the PUCA concluded in 1981 after reviewing the impact of defendant's below-cost pricing on the Westport market, the "normal taxi market [in Westport] has been severely impaired by the below cost transportation services provided by the Westport Transit District." [Pl. Ex. 9 at 3]. As the PUCA further concluded, "the Transit District's vehicle operations have effectively destroyed the . . . normal market for taxi service." [Id.] The evidence clearly established the first element of the offense of monopolization.
The second element of the offense of unlawful monopolization is proof that the monopolist engaged in anti-competitive acts in order to acquire or retain its monopoly CT Page 4974 power. To prevail, the plaintiff must demonstrate that the defendant possessed a general intent to engage in the anti-competitive practices resulting in the acquisition of market power. Alcoa, 148 F.2d at 432 (no specific intent required for a claim of monopolization. The theory is that "no monopolist monopolizes unconscious of what he is doing").
"The intent required to establish the purposeful acquisition or maintenance of monopoly power really is little more than a general intent to do the act which results in acquiring or maintaining monopoly power. Proof of specific intent to monopolize is not required." Belt, The Connecticut Anti-Trust Act: A Guide to Interpretation, 54 Conn. B.J. 348, 366 (1980); accord Brodigan, The Connecticut Antitrust Act, 47 Conn. B.J. 12, 21 (1973) ("intent per se is not a necessary ingredient").
The law is well settled that "predatory pricing" constitutes anti-competitive conduct sufficient to satisfy the second element of a monopolization claim. Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 118 (1986); Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574, 584-85 (1986). Predatory pricing is
 pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run. It is a practice that harms both competitors and competition. In contrast to price cutting aimed simply at increasing market share, predatory pricing has as its aim the elimination of competition.
Cargill, 479 U.S. at 117-18.
The evidence at trial plainly proved that the defendant willfully acquired monopoly power through a pattern of predatory pricing. Exhibits and testimony establish that it knowingly implemented a below-cost pricing system in an effort to acquire the entire Westport taxi business customer base within nine months. The evidence clearly demonstrates the improper purpose underlying defendant's pricing scheme: to eliminate competition and then replace the existing private companies with defendant's service, which then enabled defendant to raise its prices to avoid the need for further government subsidies. The defendant knew its fare structure over the first two years of Maxytaxy operations was 50% below operating cost, and that the existing private companies could not, legally or financially, match those below-cost fares. Moreover, in 1978, once the sought-after monopoly power was attained, defendants raised its fares by 28% CT Page 4975 and subsequently quadrupled the price of its annual pass and raised other rates in an effort to meet its operating costs.
Although courts have applied different measures for determining "cost," for purposes of evaluating the issue, this case requires no complex definition of the appropriate standard since it is undisputed that defendant's prices were knowingly set at 50 percent or more below its non-capital operating costs. The United States Court of Appeals for the Second Circuit has held that such pricing is presumed to be predatory. Northeastern Telephone Co. v. American Telephone and Telegraph,651 F.2d 76, 88 (2d Cir. 1981), cert. denied, 455 U.S. 943
(1982); Kelco Disposal v. Browning-Ferris Industries, supra, at 407; accord Morgan v. Ponder, supra, at 1360 (at prices below average variable cost, defendant has burden of showing non-predation). See also McGahee v. Northern Propane Gas Co., supra, at 1504 (proof of prices below short run marginal cost or average variable cost creates rebuttable presumption of predatory intent); Transamerica Computer Co., Inc. v. IBM Corp., supra, at 1386 (proof that defendant's prices were below average variable cost establishes prima facie case of predatory pricing' burden shifts to defendant to prove prices were justified without regard to any anticipated destructive effect on competition).
In this case, the evidence of defendant's below-cost pricing scheme, coupled with the direct evidence of defendant's impermissible motivation, established defendant's predatory pricing even absent the presumption allowed by the case law. Plaintiff's proof clearly establishes the second element required to sustain its monopolization claim. Defendant is, thus, liable for the injuries plaintiff suffered as a result of defendant's unlawful monopolization.
b. Attempt to Monopolize
Defendant's conduct also violated 35-27's prohibition on "attempt to monopolize."
Unlike the offense of monopolization, actual monopoly power need not be shown to establish an attempt to monopolize. The elements of an attempt to monopolize are:
 1. Specific intent to control prices or destroy competition;
 2. Predatory or anti-competitive conduct directed to accomplishing the unlawful purpose; and
3. A dangerous probability of success. CT Page 4976
Shea, 184 Conn. at 304. The evidence here plainly satisfies each of these elements.
Defendant's admissions — in its application to UMTA, in its statements to the Gilberties, and in its testimony at trial — clearly establish defendant's specific intent to destroy competition in the taxi business in Westport. The application states defendant's plan to obtain all existing ridership and replace the private companies within nine months by use of a below-cost pricing policy. Green conceded that this defendant's plan [T. 580-81], and Bradley boasted that defendant's pricing policy would drive plaintiff out of business [T. 142, 150]. Here, there was plenty of direct evidence of specific intent. There is also the reasonable and logical inference that can permissibly be drawn from the predatory pricing itself that the defendant indeed possessed the requisite specific intent to control prices and destroy competition.
With regard to the second prong, as discussed above, defendants predatory pricing at 50% below cost, with knowledge that fare increases of 50-68% would be necessary, constitutes "predatory or anti-competitive conduct directed to accomplishing the unlawful purpose."
And plainly, given the state of the taxi business in Westport in 1977 — as documented by defendant's own 1975 study — it is reasonable to conclude that there was, in fact, "a dangerous probability" that defendant's predatory pricing scheme would result in the monopolization of the taxi industry in Westport. [See Pl. Ex. 35 at A9, B14, B19].
Defendant is, thus, liable to plaintiff under 35-27 for plaintiff's injuries resulting from the offense of attempt to monopolize.
Defendant's Defense to Plaintiff's Antitrust Claims
Defendant's principal defense to plaintiff's antitrust claims is the contention that plaintiff's recovery is barred because defendant acted alone. The law is clear, however, that a plurality of actors is only required to establish a violation of the first of the three offenses prohibited by 35-27
("contract, combination or conspiracy to monopolize"). Shea,184 Conn. at 304; Brodigan, 47 Conn. B.J. at 21; Belt, 54 Conn. B.J. at 367.
Defendant also raises, for the first time, the claim that plaintiff should be barred from recovery because it did not mail a copy of its complaint to the Attorney General, as required by CT Page 4977 Connecticut General Statutes 35-37. The purpose of 35-37 is clearly to allow the Attorney General to provide the Court with his views on the merits of a given case. That purpose may still be and has already been fully satisfied in this case. Cf. D'Andrea v. Rende, 123 Conn. 377, 381-82 (1937) (failure to give required notice of dissolution of attachment to sheriff does not deprive court of subject matter jurisdiction where purpose of statutory provision not thwarted). Plaintiff has mailed a copy of its Complaint, defendant's Answer, the parties' memoranda, and the trial transcript to the Attorney General and has advised the Attorney General of the present status of this action. The Attorney General has not sought opportunity to submit any memoranda that he believes appropriate. The defendant could certainly have raised this notice issue sooner which would have allowed the plaintiff an earlier opportunity to cure this nonjurisdictional defect. Additionally, unlike Connecticut General Statutes 13a-144 or 13a-149, which clearly require certain notice provisions be complied with as a precondition to suit, Connecticut General Statutes 38-27 does not.
Moreover, although the Court in Tucker v. Alleyne,195 Conn. 399, 404 (1985) mentions in passing the plaintiff's failure to comply with 35-37, the case was resolved on the merits; additionally, Records and Briefs reveal that the Motion to Dismiss for lack of compliance with 35-37 was denied and that no issue in this regard was briefed. Therefore, the defendant's reliance on this case is ill-placed.
The defendant, in its reply brief, also contends that because the Maxytaxy's cost structure was unrenumerative and that (according to Mr. Green) the transit district was merely trying to create a better mode of transportation for its citizens, the court cannot find the defendant's pricing predatory or its its conduct anti-competitive. The fact that the cost structure was unrenumerative best illustrates the plaintiff's position. The pricing made sense precisely because it served to eliminate competition. General Industries Corp. v. Hertz Mountain Corp., 810 F.2d 795, 804 (8th Cir. 1987). Although the below cost pricing may have been instituted as a way to seduce the government into funding the project, once again, that fact does not alter the basic characterization that the defendant's conduct was intended to establish a monopoly over the town's taxi services and that it did so by virtue of a below cost pricing scheme. Moreover, the marked fare increases put in place shortly after the plaintiff's demise were instituted, not to help recoup the short term losses which came out of the government's pocket, but to make the system work which it clearly could not do while operating at 50% below operating cost. The defendant contends that in order to find a predatory price scheme, the predator must survive his own CT Page 4978 predatory prices. In this instance it was easy since the "partner" provided the start up costs and huge fare increases over a short period of time carried the district once the government money dried up. Additionally, the fact that Mr. Green expressed that his motive was to eliminate traffic and congestion in his town does not make the conduct legitimate. That this below cost taxi service was aimed at getting greater ridership does not alter the fact that its self stated goal was also to eliminate its competitors.
Finally, there remains the contention by Westport Transit District that its conduct is protected by the doctrine of governmental immunity. See Parker v. Brown, 317 U.S. 341
(1948), (which held that principles of federalism and state sovereignty render the Sherman Act inapplicable to anti-competitive restraints imposed by the state); and Hallie v. Eau Claire, 471 U.S. 361 (1985) (according Parker immunity to municipal restriction of competition in implementation of state policy). As the United States Supreme Court just ruled in City of Columbia, et al v. Omni Outdoor Advertising, Inc., 51 CCH S.Ct. Bull. p. B1428 (April 1, 1991), Parker immunity applies where a municipality's restriction of competition is an authorized implementation of state policy although it does not apply directly to municipalities or other political subdivisions of the states. Id. at B1434. For the immunity to apply, there must be authority to regulate and the city must possess clear delegated authority to suppress competition, however, it is enough "if suppression of competition is the `foreseeable result' of what the statute authorizes". Id. at B1437. In Columbia v. Omni, supra, the subject of dispute was the passing of a new ordinance by the city council which restricted the size, location, and spacing of billboards, which benefited petitioner Columbia Outdoor Advertising, Inc. (COA) which already had its billboards in place, and severely hindered Omni's ability to compete. The Supreme Court concluded that both the city and COA were entitled to immunity from the federal antitrust laws for their activities relating to enactment of the ordinances, but noted that a new trial could be held to address private anticompetitive actions, including the setting of artificially low rates by COA.
The case in issue is unique because of the legislation involved. According to Connecticut General Statutes 16-320, the PUCA governs the taxi industry. Under 7-273, as enacted in 1972, a transit district could establish and operate a taxi system. This legislation exempted taxicab regulation by the PUCA and transferred the regulatory functions of the PUCA over the taxi operation to the transit district. These districts were given broad powers of eminent domain, allowing them to "acquire all or a portion of the property and franchises of any CT Page 4979 company or companies operating a transit service in the district" if deemed "necessary to preserve or to develop a transit district." Id. [7-273e(a)].
There is no dispute in this case that the defendant could have exercised its power of eminent domain under 7-273e(a) to acquire plaintiff's certificate of public convenience and necessity, as it in fact represented to the federal government it intended to do. [T. 567-68, 572, 575-77; Pl. Ex. 35 at A10]. As defendant was well aware [T. 577], the acquisition of plaintiff's certificate would have required compensation not only for plaintiff's equipment and real property (if any), but also for the value of "the franchise itself, which represent[ed] the right to engage in the business, usually on an exclusive or semi-exclusive basis." Gray Line Bus Co. v. Greater Bridgeport Transit District, 188 Conn. 417, 423 (1982).
There is the initial question of whether the Parker doctrine applies in light of Connecticut General Statutes7-273h which provides that a transit district is subject to suit like any private entity:
 Any district operating a transit service pursuant to the provisions of this chapter shall be responsible for any injury or damage to persons or property, happening or arising by reason of the maintenance or operation of the same, in the same manner and to the same extent as though the same were owned and operated by individuals or by a private corporation.
There is nothing in Parker or its progeny that forbids a government entity from foregoing the immunity it might have.
See White v. Burns, 213 Conn. 307 (1990). Therefore, even if a governmental agency, the defendant, by virtue of the enabling legislation, remains exposed.
This raises another issue: additionally, there is a serious dispute as to whether the defendant is a municipal agency. The Town of Westport was not a party to this action and indeed wrote a letter to the court file expressing, in general, concern in this regard and, in specific, its position that the transit district was not an agency of the town. Because of the implications of a motion to intervene, the town's counsel was obviously attempting to reserve its right to litigate the issue of the defendant's status at a later point in time were the need to arise.
Finally, and of greatest significance, is the fact that the CT Page 4980 enabling legislation specifically provides for acquisition of existing competitors. The legislature recognized the consequential impairment and destruction to other taxi operators and so gave the transit districts broad powers of eminent domain. It would totally undermine the statutory scheme to allow for the creation of a transit district, to permit the district to operate taxi services, to exempt the transit district from taxi cab regulation by the PUCA, to allow the district to assume the regulatory functions of the PUCA over taxi operations, to specifically provide for broad powers of eminent domain that would require compensation for plaintiff's equipment, real property (if any) and for the value of the franchise itself but then to allow the district to effectively eliminate a taxi company by virtue of unlawful monopolization without any compensation in return. Connecticut General Statutes 7-273 contemplates the elimination of competitors in exchange for payment. This statute, on its face, very clearly negates any defense claim of entitlement to impunity or immunity.
DAMAGES
Plaintiff's actual damages in this case take two forms. First, from April 1977 to May 1978 — the period during which plaintiff attempted, ultimately unsuccessfully, to compete with defendant's Maxytaxy and its below-cost prices — plaintiff sustained lost profits as a result of its inability to implement a fare increase in accordance with the fares in effect in other similar communities.
Second, in May 1978, when plaintiff was no longer able to compete with Maxytaxy, plaintiff suffered the destruction of its taxi business as an ongoing concern, causing it to lose the value of its taxi business as of that time.
Plaintiff is entitled to recover each of these elements under his antitrust claims in count four. Because plaintiff's claim for lost profits applies to a different operating period than plaintiff's value at the time of destruction, plaintiff is entitled to recover both the lost profits through May 1978 and the value of the destroyed business thereafter. Northeastern Telephone Co. v. Am. Tel. Tel. Co.,651 F.2d at 95 n. 30.
As of 1976, plaintiff's last fare increase had been sought and granted by the PUCA in 1970. [T. 6; Pl. Ex. 1]. Although, by 1976-77, taxi companies in other Connecticut localities had obtained substantial fare increases to cover rising costs of inflation in the 1970's, plaintiff had not sought such increases. [T. 32-60; Pl. Exs. 1-8]. As plaintiff's Vice CT Page 4981 President, Michael Gilbertie, explained at trial, plaintiff was afraid to seek a fare increase in 1976-77 because it knew that defendant was about to implement the Maxytaxy service at substantially below-cost fares, below the rates then being charged by plaintiff. [T. 235-36]. Plaintiff legitimately feared that it would have trouble enough competing with Maxytaxy's service at present rates, without adding to the problem by increasing its fares. [Id.].
Plaintiff presented evidence at trial as to the taxi rates in effect in Stamford, Greenwich and Bridgeport from 1975 through 1978, establishing the repeated requests for rate increases sought by taxi companies in those localities approved by the PUCA. This data reflect — that in 1976-78 the rates charged by plaintiff were approximately 50% lower than those charged in these other communities.
Thus, in 1977, under the fare structure in Westport, plaintiff was permitted to charge $1.80 for the average one way three mile trip [Pl. Exs. 1, 2]; by comparison, the same trip in Stamford, Greenwich and Bridgeport in 1977 cost $2.70 — $2.75. [Pl. Exs. 3, 5, 8, 24].
Plaintiff also presented substantial evidence to establish that, had it requested rate increases in 1977 equal to the rate increases approved by the PUCA for Stamford, Greenwich and Bridgeport, such increases would have been granted. [T. 33-35, 37-38, 59].
Equally important, Riley testified that in setting rates, the PUCA considered a firm's net operating ratio (operating costs to gross revenue), deeming a return of between $.05 and $.15 to be appropriate for every dollar of gross revenue (with $.10 on the dollar a preferred return). [T. 21, 322-34]. Riley explained that for purposes of calculating the net operating ratio for a closely-held, family-owned franchise, officers' salaries were considered profit, except insofar as such salaries represented compensation for employee-like services. [T. 21-22].
Plaintiff presented at trial an analysis of its revenues and expenses in 1977 allocating its officers' salaries in part to the Gilberties' dispatching services and in part to profits, in accordance with this PUCA policy. [Pl. Ex. 23, 26]. This pro forma analysis showed that had plaintiff obtained a rate increase in 1977 comparable to the rates in effect in 1977 in Stamford, Greenwich and Bridgeport, plaintiff would have earned a profit of approximately $23,385.00 on its actual 1977 ridership. [Pl. Ex. 26]. CT Page 4982
The pro forma analysis — which Michael Gilbertie testified was similar to the rate analyses actually submitted to the PUCA when rate increases were sought — reflects an operating cost ratio of 87%, within established PUCA guidelines. [T. 21; see also 322-24]. This fact, coupled with the comparability of the rates in effect in similar localities, establishes that plaintiff would have obtained a rate increase comparable to the rates in Stamford, Greenwich and Bridgeport had it not been precluded from seeking an increase by practical business consideration occasioned by the Maxytaxy.
After allocating the total amount of the Gilberties' salaries in 1977 between officers' services and the dispatching services also performed by the Gilberties and allocating the different amounts to profits and expenses respectively (in accordance with PUCA policy), plaintiff showed a profit in 1977 of $5,759.12. [Pl. Ex. 23]. Had plaintiff been able to charge appropriate rates, its profit from April 1977 to May 1978 would have been approximately $23,385.00. [Pl. Ex. 26]. This figure does not include any additional upward adjustment for ridership lost to Maxytaxy in 1977 as this would have been too speculative.
Plaintiff claims it is entitled to recover the difference between these two amounts. $17,626.00, in lost profits caused by defendant's infringement of plaintiff's franchise rights through May 1978. The court has adjusted this figure to eliminate canteen/lottery portions of the revenue that were also attributable to the car rental business. This results in lost profits of $12,144.00. [$23,385.00 — $5,482.00 = $17,903.00: $17,903.00 — $5,759.00 = $12,144.00].
The 1977 pro forma also provides the basis for determining the loss sustained by plaintiff as a result of the destruction of its taxi business as an ongoing business. The value of a taxi franchise such as plaintiff's may reasonably be determined by capitalizing the likely return on investment reflected by the net operating profit, after allocating an appropriate amount for owner-employee services. [T. 362-64; Pl. EX. 27].
According to Mr. Gilbertie, in 1977 an appropriate return on investment sought by an investor purchasing plaintiff's taxi business would have been approximately 10-12%. [T. 363-64, 740]. He calculated his damages for loss of his taxi franchise based on a $23,385.00 profit (Pl's. Ex. 26). Accordingly, he claims his taxi business would have been worth between $194,875.00 and $233,850.00. His opinion as to value came not just from his estimate of what bank interest rates were at that time, but additionally based on his own experience in the taxi business for more than 20 years, his knowledge of how a taxi CT Page 4983 business was valued by the industry, his discussions with other owners, his knowledge of other sales, his membership in the Connecticut Taxi Cab Association, his membership in the International Taxi Cab Association, and finally, his own personal experience and practice in the 1960's and 1970's which was to be familiar with such values. (T. 362-63).
Mr. Gilberti's competence, as vice president and 50% stockholder of the family company was well established and his testimony provides a suitable guide to the court. See Gregg v. U.S. Industries, Inc., 887 F.2d 1462, 1469 (11th Cir. 1989):
 "This court has recognized that, in Florida, an owner of property is qualified to testify regarding the value of his property . . . . In addition, an officer of a corporation may testify to the value of the property `if the officer is qualified by virtue of his experience, his management of the affairs of the corporation and his knowledge of relevant value' . . . . Here, Gregg could testify under both conditions. His position as founder, owner and manager of his companies from their inception made him uniquely qualified to render an opinion as to the value of his businesses", (citations omitted),
and Levine v. City of Salem, 229 P.2d 255, 263-4 (1951):
 "It is no doubt competent for the owner of a business to give his opinion in evidence of the value of good will. 32 C.J.S., Evidence, 545b(2), p. 288. We think, however, that his competency is based not upon the simple fact that he is the owner, but because he is `thoroughly conversant with the business and with its management in all its details,' and that his opinion should be given only after stating the facts showing his competency. White, Corbin Co. v. Jones, 79 App.Div. 373, 79 N.Y.S. 583, 586."
No motion was made to strike Mr. Gilberti's testimony for lack of foundation and competence. Nor would one have been entertained as such evidence was within the court's discretion to admit. Love joy v. Darien, 131 Conn. 533, 536 (1945). There need exist a reasonable foundation from which the finder of fact can calculate the amount of damages. Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1352-53 (3d Cir. 1975) Provided that is the case, CT Page 4984
 "damages may be ascertained from a jury's just and reasonable inference from proof of the wrongful act, its tendency to injure plaintiff's business, and evidence of decline in profits. Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).
See also, Northwestern Telephone Co. v. American Tel Tel Co.,497 F. Sup. 230, 248 (USDC Ct. 1980):
 "As stated previously, the Supreme Court has not required antitrust plaintiffs to carry a heavy burden with respect to a showing of the amount of damages." (citations omitted);
and SCM Corp. v. Xerox Corp., 507 F.2d 358, 363 (2nd Cir. 1974)
 "The latitude granted the victim of antitrust violations in establishing his monetary damages has long been recognized. . . . Note that in the last-named case, the fact that plaintiff had not operated his business at all during the relevant period did not prevent the district court from awarding money damages in the form of probable lost profits." (citations omitted).
As indicated earlier, the court has adjusted the figures as set forth in Pl's. Exs. 26 and 27 to eliminate the canteen/lottery revenue of $5,482.00. This results in a profit of $17,903.00 ($23,385.00 — $5,482.00). Using Mr. Gilberti's measure of value, the plaintiff's taxi franchise would have been within the range of $149,131.99 to $179,030.00 in 1978.
Plaintiff is further entitled to prejudgment interest on its losses, in the sum of $14,026.32 on its lost profits ($12,144.00) and in the sum of $173,250.00 on the value of the business ($150,000.00). Connecticut General Statutes 37-3a
and 35-44. The court has calculated prejudgment interest at the statutory rates in effect pursuant to 37-3a over the years at issue (6% Per annum from May 1978 through September 1979, 8% from October 1979 through September 1983, and 10% from October 1983 to March 1991). Neiditz v. Morton S. Fine Assoc., Inc.,199 Conn. 683, 690 (1986).
Plaintiff's actual damages are, thus, as follows:
Lost profits (April 1977 — CT Page 4985 May 1978) $ 12,144.00
 Prejudgment interest on lost profits 14,026.32
Value of business (May 1978) 150,000.00
 Prejudgment interest on value of business through March, 1991 173,250.00
Total $349,420.32
Pursuant to Connecticut General Statutes 35-35, plaintiff is entitled to recover treble damages for the injury to its taxi business caused by defendant's antitrust violations. Plaintiff's actual damages must be trebled, for total damages under Count Four[1] of the Complaint of $1,048,260.96.
KATZ, J.